**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Accel, Inc. v. Testa,* **Slip Opinion No. 2017-Ohio-8798.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2017-OHIO-8798

ACCEL, INC., APPELLEE AND CROSS-APPELLANT, *v*. TESTA, TAX COMMR., APPELLANT AND CROSS-APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Accel, Inc. v. Testa,* Slip Opinion No. 2017-Ohio-8798.]**

*Sales and use tax—R.C. 5739.02(B)(42)(a) and 5739.01(R)—Tax exemption for purchases of items used in "assembling" or "assembly"—R.C. 5739.01(JJ)(3)—Tax exemption for employment-services transactions involving employees assigned "on a permanent basis"—Decision of Board of Tax Appeals affirmed.*

(No. 2015-1332—Submitted September 26, 2017—Decided December 6, 2017.)

APPEAL from the Board of Tax Appeals, No. 2012-2840.

_____

**Per Curiam.**

{¶ 1} The Ohio Tax Commissioner, appellant and cross-appellee, conducted a consumer-use-tax audit of certain purchases made by appellee and cross-appellant, Accel, Inc., during the period January 1, 2003, through December

31, 2009, and the tax commissioner issued a tax assessment based on that audit. On appeal, the Board of Tax Appeals ("BTA") affirmed the assessment in part and reversed the assessment in part.

{¶ 2} The BTA reversed the imposition of use tax on materials Accel acquired to be used and incorporated into gift sets, holding that the purchases were entitled to exemption under R.C. 5739.02(B)(42)(a) and 5739.01(R) because the preparation of the gift sets involved "assembling" or "assembly." The BTA also reversed the imposition of use tax on certain transactions by which Accel obtained "employment services" through one of its suppliers, holding that the transactions were exempt under R.C. 5739.01(JJ)(3), which exempts transactions involving the assignment of employees "on a permanent basis." The tax commissioner appeals these findings and asserts in conjunction with his appeal that the BTA should have deferred to his own factual findings.

{¶ 3} In its cross-appeal, Accel contests the BTA's ruling that no portion of the assessment is time-barred by R.C. 5703.58(B). Accel also contends that the production of gift sets qualifies for exemption directly under the definition of "manufacturing operation" in R.C. 5739.01(S) and that the employment-services transactions with a different supplier should also have been exempted.

{¶ 4} Finally, each party contests the BTA's decision to admit into evidence the report and testimony of the opposing party's expert witness.

{¶ 5} Based on our review of the issues presented, the record before us, the briefs, and the relevant case law, we conclude that the BTA acted reasonably and lawfully with respect to all of the contested findings. We therefore affirm the decision of the BTA.

## COURSE OF PROCEEDINGS

{¶ 6} The tax commissioner issued a use-tax assessment against Accel on January 18, 2011. Accel petitioned for reassessment, and the tax commissioner issued his final determination on June 26, 2012, stating the amount of unpaid use

tax as $2,447,159.84, plus preassessment interest of $651,862.91 and a penalty of $122,357.99, for a total assessment of $3,221,380.74. Accel appealed to the BTA.

{¶ 7} The BTA held a hearing at which Accel presented the testimony of its president, its cost-accounting manager, an expert on manufacturing, the tax department's audit agent, Accel's chief financial officer, and the chief financial officer of Resource Staffing, Inc., a company through which Accel obtained some of its workers. The tax commissioner presented the testimony of an expert on packaging. Numerous exhibits were introduced into evidence, some subject to objections to be resolved by the BTA in its decision.

{¶ 8} The BTA found that those items purchased by Accel that, through "assembly," became part of the gift sets qualified for exemption. BTA No. 2012-2840, 2015 WL 4410600, *3-4 (July 15, 2015). It arrived at this conclusion in two steps. First, the BTA stated that Accel was not engaged in "merely packaging products," and it went on to find that "Accel's activities do not involve packaging." *Id.* at *3. Second, the BTA determined that Accel's preparation of the gift sets did constitute "assembly." *Id.* at *4.

{¶ 9} Next, the BTA found that the evidence showed that the employees supplied to Accel by Resource Staffing were assigned "on a permanent basis," with the result that Accel did not owe sales or use tax on the purchase of employment services from Resource Staffing. *Id.* at *5. In contrast, the BTA found that there was insufficient evidence for it to find that employees supplied to Accel by Manpower, Inc., were assigned on a permanent basis, so those transactions were found to be taxable. *Id*. at *6.

{¶ 10} Finally, the BTA found that R.C. 5703.58(B) imposed no time bar on any aspect of the assessment, because that provision did not take effect until after the tax commissioner issued the assessment. *Id*.

## ANALYSIS

### Standard of Review

{¶ 11} In reviewing a decision of the BTA, we determine whether the decision is "reasonable and lawful." *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14. Although the BTA is responsible for determining factual issues, this court " 'will not hesitate to reverse a BTA decision that is based on an incorrect legal conclusion.' " *Id.*, quoting *Gahanna-Jefferson Local School Dist. Bd. of Edn. v. Zaino*, 93 Ohio St.3d 231, 232, 754 N.E.2d 789 (2001).

### The BTA Reviews Tax-Commissioner Determinations De Novo

{¶ 12} Under his second proposition of law, the tax commissioner argues that the BTA erred because it "merely substituted its own fact finding for that of the Tax Commissioner." The tax commissioner relies on *Hatchadorian v. Lindley*, 21 Ohio St.3d 66, 488 N.E.2d 145 (1986), paragraph one of the syllabus, which articulates a "clearly unreasonable or unlawful" standard for rebutting the tax commissioner's findings. We have mentioned that standard in subsequent cases. *E.g., Am. Fiber Sys., Inc. v. Levin*, 125 Ohio St.3d 374, 2010-Ohio-1468, 928 N.E.2d 695, ¶ 42; *Newman v. Levin*, 120 Ohio St.3d 127, 2008-Ohio-5202, 896 N.E.2d 995, ¶ 31; *Nusseibeh v. Zaino*, 98 Ohio St.3d 292, 2003-Ohio-855, 784 N.E.2d 93, ¶ 10. Although the "clearly unreasonable and unlawful" standard does imply that the BTA should accord deference to the tax commissioner's findings of fact, two strands of case law establish that deference is not required.

{¶ 13} First, longstanding case law unequivocally holds that the BTA's standard for reviewing the tax commissioner's findings is de novo, as to both facts and law. *Key Servs. Corp. v. Zaino*, 95 Ohio St.3d 11, 16, 764 N.E.2d 1015 (2002), citing *Higbee Co. v. Evatt*, 140 Ohio St. 325, 332, 43 N.E.2d 273 (1942); *accord MacDonald v. Shaker Hts. Bd. of Income Tax Rev.*, 144 Ohio St.3d 105, 2015-Ohio-

4

3290, 41 N.E.3d 376, ¶ 21. De novo review is, of course, the opposite of deferential review.

{¶ 14} Second, our case law establishes—without any reference to a "clearly unreasonable" standard—that the tax commissioner's findings are presumed valid subject to rebuttal: "The rule is well settled that a taxpayer challenging the assessment has the burden to ' " 'show in what manner and to what extent * * * the commissioner's investigation and audit, and the findings and assessments based thereon, were faulty and incorrect.' " ' " *Krehnbrink v. Testa*, 148 Ohio St.3d 129, 2016-Ohio-3391, 69 N.E.3d 656, ¶ 30, quoting *Maxxim Med., Inc. v. Tracy*, 87 Ohio St.3d 337, 339, 720 N.E.2d 911 (1999), quoting *Federated Dept. Stores, Inc. v. Lindley*, 5 Ohio St.3d 213, 215, 450 N.E.2d 687 (1983), quoting *Midwest Transfer Co. v. Porterfield*, 13 Ohio St.2d 138, 141, 235 N.E.2d 511 (1968). Notably, under this standard, the burden for rebutting the tax commissioner's findings is simply to prove that the findings were incorrect.

{¶ 15} We recently invoked the *Hatchadorian* standard in the context of vacating a finding of the BTA that had contradicted the tax commissioner's own finding that a trust was a "nonresident trust" for purposes of R.C. 5747.01(I)(3). *T. Ryan Legg Irrevocable Trust v. Testa*, 149 Ohio St.3d 376, 2016-Ohio-8418, 75 N.E.3d 184, ¶ 62-63. But close examination shows that our decision in that case did not require the BTA to defer to the tax commissioner as a finder of fact. To the contrary, we set forth two specific reasons for setting aside the BTA's finding of the trust's residency. First, the BTA's finding was defective because the BTA failed to consider one essential statutory element of trust residency. *Id.* at ¶ 58. Second, the tax commissioner's finding that the trust was a nonresident trust had not been contested at the BTA and no probative evidence had been presented to show that the tax commissioner's original determination was factually incorrect. *Id.* at ¶ 62. These considerations did not cause us to reverse the BTA's residency finding; instead, we vacated the BTA's finding on the grounds that the presumptive

validity of the tax commissioner's finding had not been rebutted because it had not been contested, with an offer of proof, at the BTA.  *Id*. at ¶ 63.  Thus, as relevant here, *T. Ryan Legg Irrevocable Trust* stands for nothing more than the proposition that the BTA must affirm a finding of the tax commissioner when the finding has not been shown to be incorrect.

{¶ 16} For the foregoing reasons, we reject the tax commissioner's second proposition of law.  We hold that the BTA owed no deference to the tax commissioner's findings beyond placing the evidentiary burden on the taxpayer, Accel, to show them to be, by a preponderance of the evidence, incorrect.  And in reviewing the BTA's own factual findings, "[w]e must affirm * * * if they are supported by reliable and probative evidence, and we afford deference to the BTA's determination of the credibility of witnesses and its weighing of the evidence subject only to an abuse-of-discretion review on appeal."  *HealthSouth Corp. v. Testa*, 132 Ohio St.3d 55, 2012-Ohio-1871, 969 N.E.2d 232, ¶ 10.

## Accel's Preparation of Gift Sets Could Reasonably Be Found to Involve "Assembling" or "Assembly"

{¶ 17} R.C. 5739.02(B)(42)(a) provides an exemption from taxation for "[s]ales where the purpose of the purchaser is to * * * incorporate the thing transferred as a material or a part into tangible personal property to be produced for sale by manufacturing, *assembling*, processing, or refining * * *."  (Emphasis added.)  "Manufacturing" is not by itself defined, but "manufacturing operation" is defined in R.C. 5739.01(S):

> "Manufacturing operation" means a process in which materials are changed, converted, or transformed into a different state or form from which they previously existed and includes refining materials, *assembling parts*, and preparing raw materials and parts by mixing, measuring, blending, or otherwise committing

such materials or parts to the manufacturing process. "Manufacturing operation" does not include packaging.

(Emphasis added.) R.C. 5739.01(R) defines "assembly" and "assembling" as "attaching or fitting together parts to form a product, but [assembly and assembling] do not include packaging a product."

{¶ 18} The BTA applied these interlocking definitions to find that Accel's gift-set production involved "assembly" or "assembling" but not "manufacturing" per se. According to the BTA, Accel was attaching or fitting together components to create a new whole but it was not engaging in an operation producing the type of change of form that characterizes manufacturing per se. 2015 WL 44106005 at *4, citing *Sauder Woodworking Co. v. Limbach*, 38 Ohio St.3d 175, 177, 527 N.E.2d 296 (1988). The BTA also specifically found that Accel's activities did not constitute "packaging." *Id*. at *3.

{¶ 19} Under his third proposition of law, the tax commissioner contests the BTA's finding that Accel was not engaged in "packaging"; under his fourth proposition of law, the tax commissioner challenges the finding that "assembling" was involved. In its cross-appeal, Accel challenges the BTA's finding that it was not engaged in "manufacturing." Although we agree with the tax commissioner that the activity at issue did meet the definition of "packaging," we reject his contention that the activity did not constitute "assembling." And because we hold that the BTA reasonably and lawfully found that assembling was involved, we need not consider whether Accel was engaged in manufacturing per se.

{¶ 20} At the outset, there was sufficient evidence to support the BTA's finding that "Accel does more than merely package products," 2015 WL 4410600 at *3, and that Accel engaged in "assembling." Accel's cost-accounting manager testified that Accel produced its gift sets through a three-stage process—a design phase, a planning phase, and an assembly phase. In the design phase, Accel worked

with its clients "to brainstorm ideas on how to build that gift set, how that gift set is going to be presented in an aesthetic form so that it is sellable in a retail environment." The design phase also involved drawing up a written "specification" document setting forth instructions for building the gift set and stating the materials to be used. Those instructions were then incorporated into an internal document for Accel's use that set forth the production-line procedures it would employ. The initial two phases involved determining the costs of the items to be included in the gift set and the cost of the labor to do the assembly. The design and planning process usually took between two and six months to complete before the assembly phase began. According to its cost-accounting manager, Accel was engaging in approximately 217 such projects per year at the time of the BTA hearing.

{¶ 21} The tax commissioner levels a four-pronged legal challenge to the BTA's finding. First, the tax commissioner argues that a canon of statutory construction, noscitur a sociis, calls for construing "assembling" to involve a change in state or form in the same way "manufacturing," "processing," and "refining" would. The Latin phrase means "it is known by its associates," *Black's Law Dictionary* 1224 (10th Ed.2014); the tax commissioner maintains that the scope accorded to "assembling" must be limited by the other terms included in R.C. 5739.02(B)(42)(a).

{¶ 22} We disagree. The fact that the legislature chose to define "assembling" in R.C. 5739.01(R) in accordance with its ordinary meaning indicates the intent that "assembling" adds an element to the listing in R.C. 5739.02(B)(42)(a) that is otherwise absent. Under this reading, "assembling" extends the exemption to situations in which there is no transformation of substances but there is a putting together of components into a new functional (or in this case aesthetic) whole. *See Webster's Third New International Dictionary* 131 (2002) (defining "assemble" in part as "to fit together various parts of so as to

8

make into an operative whole"). This is clear enough that we need not resort to the statutory canon noscitur a sociis.

{¶ 23} Second, the tax commissioner argues that because the definition of "assembling" in R.C. 5739.01(R) excludes "packaging," any activity that qualifies as "packaging" cannot constitute "assembling." Thus, according to the tax commissioner, even if an activity independently qualifies as manufacturing, assembling, processing, or refining, it does not trigger the exemption if it also constitutes "packaging."

{¶ 24} To consider this argument, it is necessary to consult the statutory definition of "packaging"; R.C. 5739.02(B)(15) defines "packages" and "packaging" in connection with the packaging exemption as follows:

> "Packages" includes bags, baskets, cartons, crates, boxes, cans, bottles, bindings, wrappings, and other similar devices and containers, but does not include motor vehicles or bulk tanks, trailers, or similar devices attached to motor vehicles. *"Packaging" means placing in a package*.

(Emphasis added.)

{¶ 25} The preparation of gift sets clearly involves "placing in a package" because the various items Accel included in the gift sets—manufactured soaps, lotions, and other accessory and toiletry items—were boxed, wrapped, and bound together in being made part of a gift set. Moreover, the activity satisfies the case-law consideration that "packaging" involves "restrain[ing] movement" of the items in the gift set "in more than one plane of direction." *Custom Beverage Packers, Inc. v. Kosydar*, 33 Ohio St.2d 68, 73, 294 N.E.2d 672 (1973). We accordingly disagree with the BTA's conclusion that Accel's activities did not constitute "packaging."

{¶ 26} Although Accel's operations did involve packaging, that fact alone does not disqualify its production of gift sets from constituting "assembling." The issue here is how to treat an activity that is covered by *both* the assembling definition *and* the packaging definition, and the case law cuts against the tax commissioner's position in this regard. In *Cole Natl. Corp. v. Collins*, 46 Ohio St.2d 336, 339, 348 N.E.2d 708 (1976), this court effectively held that "packaging" can be an incidental function, meaning that even when the packaging definition applies, that is not determinative of the taxable status of the transactions.

{¶ 27} In *Cole Natl.*, a manufacturer sought to obtain the packaging exemption for display cases and racks that contained manufactured merchandise; the manufacturer shipped the initial order of merchandise to a retailer in the display cases or on display racks. Thus, the display cases and racks served as packages, but they were also designed to be used by retailers to store and display the merchandise for sale to customers. *Id.* at 336-337. This court affirmed the denial of the packaging exemption for the display cases and racks, holding that the function of the display cases and racks as packaging was "incidental to their use as a marketing aid." *Id.* at 339. By the same logic, the fact that the gift sets here functioned as "packaging" for the included items is incidental to the fact that in assembled form, they constituted a new and differently marketable product.

{¶ 28} Third, the tax commissioner contends that Accel's own use of the words "package" and "packaging" in describing its business to the public cuts against its exemption claim. And the record contains promotional materials and news articles in which Accel's executives and others refer to the company's participation in the "contract packaging industry," call the company a "contract packager," and refer to its production as involving "packaging." This is, of course, significant because the definitions of "assembling," R.C. 5739.01(R), and "manufacturing operation," R.C. 5739.01(S), both specifically exclude the mere "packaging" of a product. But the BTA's rejection of this argument was not

unreasonable—Accel's promoting itself as a "packager" for business purposes did not necessarily preclude the conclusion that its operations involved "assembling" as that word is specially defined for purposes of tax exemption.

{¶ 29} Fourth, the tax commissioner contends that case law of this court precludes the BTA's finding that "assembling" occurred in this case. This argument is unpersuasive because the cases the tax commissioner relies on did not involve a situation in which manufactured goods were (at least arguably) being "assembled" into a new, separately marketable whole. For example, *Fichtel & Sachs Industries, Inc. v. Wilkins*, 108 Ohio St.3d 106, 2006-Ohio-246, 841 N.E.2d 294, was a personal-property-tax-exemption case involving the issue whether putting clutch components into packages for shipment constituted "processing," thereby defeating a claimed exemption for inventory held "for storage only" under R.C. 5701.08 and 5711.22. We did state that "[p]ackaging is not processing," *id.* at ¶ 40, but the issue in *Fichtel & Sachs* is not apposite to the one presented in this appeal, which involves "assembling" manufactured items into a new aesthetic whole.

{¶ 30} In *Sauder Woodworking*, 38 Ohio St.3d at 176, 527 N.E.2d 296, a manufacturer of "knock down" furniture—furniture that was sold in an unassembled state to consumers—sought a sales-and-use-tax exemption for boxes in which furniture components were shipped. Sauder Woodworking argued that the packaging material was exempt because it was used directly in manufacturing or processing its products; we agreed with the tax commissioner and the BTA in rejecting this contention, based on the principle that "the container is [not] an inherent part of the product, as the furniture was equally functional and usable prior to its packaging." *Id.* at 177. By contrast, the gift sets in this case do constitute a new product of which the packaging materials are a component.

{¶ 31} In *Scholz Homes, Inc. v. Porterfield*, 25 Ohio St.2d 67, 266 N.E.2d 834 (1971), forklifts were used to move component parts that were later to be

assembled into homes from a plant's "fabricating" area to an "expediting" area, where the items were packed for shipment. *Id.* at 68-69. Rejecting a claim that the forklifts were used as part of a process that involved "assembling," we held that "assembling" means "more than the mere gathering together of fabricated materials"; "assembling" means fitting together various parts to make a new operative whole. *Id*. at 72. Quite simply, the BTA was justified in finding that the activity at issue in this case constituted "assembling," as the word is described in *Scholz Homes*.

{¶ 32} For the foregoing reasons, we reject the tax commissioner's first through fourth propositions of law relating to the BTA's finding that Accel was engaged in "assembling." At oral argument, counsel for the tax commissioner advanced an alternative contention that "some of this stuff is not even [the production of] a gift set; it's 'I'm putting it in a box to send it off.' " But neither the notice of appeal nor the tax commissioner's main brief argues that the case should be remanded with an instruction that transactions that involved "assembling" of gift sets should be segregated from those transactions that did not. Under these circumstances, the tax commissioner has abandoned the argument. *See Navistar, Inc. v.* Testa, 143 Ohio St.3d 460, 2015-Ohio-3283, 39 N.E.3d 509, ¶ 39, citing *E. Liverpool v. Columbiana Cty. Budget Comm.*, 116 Ohio St.3d 1201, 2007-Ohio-5505, 876 N.E.2d 575, ¶ 3.

**Accel's Transactions with Resource Staffing Could Reasonably Be Found Exempt under R.C. 5739.01(JJ)(3)**

{¶ 33} "Employment service" is subjected to sales and use tax pursuant to R.C. 5739.02 and 5739.01(B)(3)(k). Pursuant to R.C. 5739.01(JJ):

"Employment service" means providing or supplying personnel, on a temporary or long-term basis, to perform work or labor under the supervision or control of another, when the

12

personnel so provided or supplied receive their wages, salary, or other compensation from the provider or supplier of the employment service or from a third party that provided or supplied the personnel to the provider or supplier. "Employment service" does not include:

　　* * *

(3)　Supplying personnel to a purchaser pursuant to a contract of at least one year between the service provider and the purchaser that specifies that each employee covered under the contract is assigned to the purchaser on a permanent basis.


**{¶ 34}** The BTA found that Accel's dealings with Resource Staffing qualified under the permanent-assignment exemption of R.C. 5739.01(JJ)(3), while Accel's dealings with Manpower did not. Under his fifth proposition of law, the tax commissioner contests the first finding; on cross-appeal, Accel contests the latter finding.

*The BTA made no formal finding concerning the "supervision or control" of*
*personnel supplied by Resource Staffing*

**{¶ 35}** After determining that Accel's arrangements with Resource Staffing triggered the permanent-assignment exemption, the BTA stated:


Moreover, Accel argues that the employees provided by Resource Staffing were not "under the supervision or control of another," as is required to meet the definition of "employment service" in R.C. 5739.01(JJ). The testimony of [Moises Lluberes] indicated that Resource Staffing supplied supervisors, on its own payroll, not Accel's, to supervise and direct the employees provided for Accel's production activities.

2015 WL 4410600 at *6. The BTA's decision then starts a new paragraph addressing a totally different subject: whether Accel's arrangement with Manpower triggered the permanent-assignment exemption.

{¶ 36} In his notice of appeal and his brief, the tax commissioner treats the statement quoted above as if it were a finding and then argues that the BTA erred in making that finding. The tax commissioner points out that the contract between Resource Staffing and Accel itself recited that the employees would be under Accel's supervision and control. In its brief, Accel also treats the BTA's statement as if it were a finding that the personnel did not act under Accel's own supervision and control.

{¶ 37} We conclude that the quoted passage from the BTA's decision does not constitute a formal finding. The passage recites an additional argument advanced by Accel and alludes to its evidentiary significance, but it does not explicitly draw any conclusion as to the argument's validity. And making such a finding was unnecessary, because the BTA had already found that the permanent-assignment exemption applied to Accel's dealings with Resource Staffing. Because there was no formal finding regarding the supervision of the employees, we decline to address this contention.

*The tax commissioner raises legal arguments that have been rejected by the case law*

{¶ 38} On its face, the permanent-assignment exemption of R.C. 5739.01(JJ)(3) appears to turn on the content of the employment-services contract underlying the transaction. And consistent with that plain reading, the tax commissioner's fifth proposition of law asserts that the BTA erred by finding that the permanent-assignment exemption applied regarding employees supplied to Accel by Resource Staffing: "When an employment services contract fails to provide an express term for 'permanent' employees, the [BTA] cannot supply the missing terms by inquiring into facts and circumstances of the employment

relationship." The tax commissioner then focuses his argument on the content of the written employment-services agreement between Accel and Resource Staffing.

{¶ 39} But the tax commissioner is reviving an argument that this court has rejected in previous cases. This court has twice declined to adopt an analysis that narrowly focuses on whether an employment-services contract "specifies" permanent assignment and has instead applied a broader facts-and-circumstances test. First, in *H.R. Options, Inc. v. Zaino*, 100 Ohio St.3d 373, 2004-Ohio-1, 800 N.E.2d 740, the tax commissioner had argued to the BTA that H.R. Options's contracts with its clients contained "no contractual provision that 'specifies permanent' assignment" and that its "practice of continuous employment cannot be offered as evidence when no written contract provision exists." *See* BTA No. 2001-M-808, 2002 WL 1813907, *3 (Aug. 2, 2002). Neither the BTA nor this court accepted the tax commissioner's contract-centered approach. Indeed, this court's analysis placed greater emphasis on the individual employment contracts between the employees and the employment-services provider that were in the record than on the overarching employment-services contracts between the provider and its clients. *H.R. Options* at ¶ 23-25.

{¶ 40} In *H.R. Options*, we articulated a test that does not emphasize the wording of the employment-services contract, as advocated by the tax commissioner here. Instead, the test for permanent assignment has two elements: (1) the employee must be assigned for an indefinite period, i.e., the contract stating the employee's assignment does not specify an ending date, and (2) the employee must not be provided as a substitute for a current employee who is on leave or to meet seasonal or short-term-workload needs. *Id*. at ¶ 21. In applying the test, "both the contract and the facts and circumstances of the employee's assignment are factors that must be reviewed to determine whether the employee is being assigned on a permanent basis." *Id.* Most significantly, we then approved the exemption from taxation for some of the employees based on the facts and circumstances when

the employment-services contract between the provider and the client plainly did not specify that they were assigned on a permanent basis. *Id*. at ¶ 23-24. And we remanded transactions involving certain other employees to the BTA for further review to determine whether they were purely seasonal, i.e., nonexempt, assignments. *Id*. at ¶ 26.

{¶ 41} In *Bay Mechanical & Elec. Corp. v. Testa*, 133 Ohio St.3d 423, 2012-Ohio-4312, 978 N.E.2d 882, ¶ 19, we explained that in *H.R. Options*, we had "construed the exemption as turning on the facts of each employee's assignment rather than on the presence of 'magic words' in the employment-service agreements themselves." We then took the additional step of holding that the presence of the "magic words" in the employment-services contracts could not, in light of *H.R. Options*, be dispositive in favor of exemption. *Bay Mechanical* at ¶ 22.

{¶ 42} The tax commissioner tries to bolster his emphasis on R.C. 5739.01(JJ)(3)'s "specifies" language with a contract-law argument. The tax commissioner contends that an approach that determines the exemption's applicability based on facts-and-circumstances evidence violates principles of contract law by allowing course of performance to supply a contract term that is not present in the actual contract. The tax commissioner maintains that because under contract law, a contract term that is not set forth in the contract itself is "deemed to have no existence," *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53, 544 N.E.2d 920 (1989), and therefore cannot be shown by extrinsic evidence, R.C. 5739.01(JJ)(3) cannot properly be construed to support application of a facts-and-circumstances test to establish that the employees here were "assigned * * * on a permanent basis" when the employment-services contract failed to specify permanent assignment.

{¶ 43} This argument also is at odds with the case law. It cannot be reconciled with the facts-and-circumstances test set forth in *H.R. Options* and explained by *Bay Mechanical*. Indeed, the tax commissioner's argument had been

rejected by the BTA at the time *H.R. Options* was decided, and those earlier decisions formed the basis for the approach taken in *H.R. Options*. *See Bay Mechanical* at ¶ 23 ("*H.R. Options* adopts a consistent theme sounded by the BTA itself when reviewing exemption claims: when 'determining whether an exception or exemption to taxation applies, it is not just the form of a contract that is important,' but instead, the 'crucial inquiry becomes a determination of what the seller is providing and of what the purchaser is paying for in their agreement' "), quoting *Excel Temporaries, Inc. v. Tracy*, BTA No. 97-T-257, 1998 WL 775284, *2 (Oct. 30, 1998).

{¶ 44} For the foregoing reasons, the tax commissioner's objections based on his proposed interpretation of R.C. 5739.01(JJ)(3) to the BTA's finding regarding permanent assignment of the Resource Staffing employees are without merit.

*The BTA's finding of permanent assignment is neither unreasonable nor unlawful*

{¶ 45} In his brief, the tax commissioner then turns away from his contract-centered argument based on R.C. 5739.01(JJ)(3)'s wording and delves into the facts and circumstances of this case. Most importantly, he points to substantial evidence in the record that the employee assignments at issue here may have been seasonal or designed to meet "short-term workload conditions," *H.R. Options*, 100 Ohio St.3d 373, 2004-Ohio-1, 800 N.E.2d 740, at ¶ 21. Under *H.R. Options*, neither of those types of assignment transactions qualifies for the permanent-assignment exemption. The tax commissioner in his final determination had found "compelling" evidence that Accel's "labor force fluctuates with the seasons," noting the nature of its business and the fact that invoices from Manpower and Resource Staffing demonstrated fluctuating payroll dollar amounts with heaviest spending on employee labor from August through December, and therefore had determined that the employees were "seasonal in nature."

**{¶ 46}** In arriving at a contrary conclusion regarding employees supplied by Resource Staffing, the BTA relied primarily on the testimony of Accel's chief financial officer, Daniel Harms, and Moises Lluberes, the chief financial officer of Resource Staffing. The gist of their testimony was that Accel sought to have employees return for job after job once they had been trained and that during periods when less work was available, Resource Staffing would reduce the hours the employees worked rather than discharging them. Lluberes specifically testified that Resource Staffing supplied 647 persons to Accel as employees from 2006 through 2011 (when its contract with Accel ended) and that about 358 of those employees worked more than one year at Accel.[1] Lluberes also testified that Resource Staffing would not reassign personnel placed with Accel to other clients when the workload at Accel decreased. The BTA relied on this testimony to conclude that the personnel supplied by Resource Staffing were "assigned on a permanent basis." 2015 WL 4410600 at *5.

**{¶ 47}** Although there is no question that the number of Resource Staffing workers at Accel fluctuated significantly throughout the year and was greatest during the fall as the holidays approached, the BTA concluded that the retention of the same personnel through high-activity and low-activity periods negated their status as seasonal employees. This is best viewed as an aspect of the BTA's factual determination that merits our deference.

**{¶ 48}** Ultimately, the distinction between seasonal or short-term-workload employment and more regular employment is one of degree, not of kind. In every enterprise, the workload may experience periods of ebb and flow. It seems entirely

---

[1] Lluberes testified in part based on an exhibit that the BTA in its decision ultimately struck from the record. The exhibit was a document stating the names and tenures of employees supplied by Resource Staffing to Accel and was prepared at Lluberes's direction by Resource Staffing's accounting department. But even if he had not stated precise numbers, Lluberes's testimony explained the nature of the permanent-assignment relationship, as to which he was not cross-examined. And the tax commissioner did not move to strike Lluberes's general testimony regarding the employees' tenures, which appeared to rely on a foundation beyond that of the excluded exhibit.

reasonable, therefore, that what matters in an ebb-and-flow business for purposes of R.C. 5739.01(JJ)(3) and our precedents is the continuity of the workforce, i.e., are the same workers having their hours adjusted or are new workers being brought in to handle the extra work during the busy season only?  Based on Lluberes's testimony, the BTA found the former to be true.  Under *H.R. Options*, bringing back the same workers each time with differing hours is consistent with permanent assignment; using new workers just for a brief workload spike is not.

**{¶ 49}** The tax commissioner argues that Lluberes's testimony was so biased that the BTA could not have reasonably relied on it.  But as discussed, we review the BTA's weighing of evidence and determinations of witness credibility under an abuse-of-discretion standard, meaning that we will reverse a decision of the BTA only if we detect an arbitrary or unconscionable attitude.  *HealthSouth Corp.*, 132 Ohio St.3d 55, 2012-Ohio-1871, 969 N.E.2d 232, at ¶ 10; *NWD 300 Spring, L.L.C. v. Franklin Cty. Bd. of Revision*, ___ Ohio St.3d ___, 2017-Ohio-7579, ___ N.E.3d ___, ¶ 14.  Although Lluberes undeniably had a business interest in relation to his testimony, the BTA did not abuse its discretion by crediting that testimony in spite of any possible bias.

### The BTA Reasonably Concluded that Accel Did Not Show that Manpower Personnel Were Permanently Assigned

**{¶ 50}** On cross-appeal, Accel argues that the BTA erred by regarding the evidence as insufficient to establish that the personnel supplied by Manpower were also permanent-assignment employees.  *See* 2015 WL 4410600 at *6.  Accel challenges that finding by pointing to the affidavit of its president, David Abraham.

**{¶ 51}** Abraham's affidavit summarily recited that no written agreement existed with Manpower but that the parties contemplated "a long term relationship of at least one year" and that Accel requested that the employees be assigned indefinitely because they would have been trained and exposed to confidential manufacturing processes.  The affidavit also detailed some types of work performed

by the employees.  Notably, the affidavit did not even address the question of seasonal labor.

{¶ 52} We reject Accel's contention that the BTA erred by failing to grant exemption based on the affidavit.  Accel bore the burden of proof to show that it was entitled to a tax exemption, but it adduced a much smaller quantum of proof with respect to the Manpower transactions than it did regarding the transactions involving Resource Staffing, failing to even address central concerns regarding the applicability of the exemption for the transactions involving Manpower.  Under these circumstances, Accel has failed to demonstrate an abuse of discretion.

### R.C. 5703.58(B) Is Inapplicable Because It Became Law after the Issuance of the Assessment at Issue

{¶ 53} R.C. 5703.58(B) prohibits the tax commissioner from "mak[ing] or issu[ing] an assessment against a consumer for any tax due under Chapter 5741 of the Revised Code, or for any penalty, interest, or additional charge on such tax, if the tax was due before January 1, 2008."  Accel argues on cross-appeal that this provision applies to this case.  If the provision is applicable, it would bar a considerable portion of the tax commissioner's assessment.

{¶ 54} But the provision was enacted as part of 2011 Am.Sub.H.B. No. 153, and it became effective on September 29, 2011.  The tax commissioner issued his assessment on January 18, 2011.  Because the provision was not in effect when the tax commissioner issued his assessment, it did not bar the issuance of that assessment.  We therefore affirm the BTA's ruling on this point.

### The BTA Did Not Abuse Its Discretion Regarding the Expert Testimony and Experts' Reports

{¶ 55} On various grounds, each party contests the other party's expert testimony and expert's written report offered into evidence at the BTA hearing.  Our starting point for evaluating the arguments is that we accord the BTA wide discretion in evaluating proffered expert testimony.  *Steak 'n Shake, Inc. v. Warren*

*Cty. Bd. of Revision*, 145 Ohio St.3d 244, 2015-Ohio-4836, 48 N.E.3d 535, ¶ 20 ("the proper use of expert opinions [lies] within the sound discretion of the BTA," and this court "defer[s] to the BTA's determination of the *competency* as well as to the board's determination of the *credibility* of the evidence presented to it" [emphasis sic]); *accord Johnston Coca-Cola Bottling Co., Inc. v. Hamilton Cty. Bd. of Revision*, 149 Ohio St.3d 155, 2017-Ohio-870, 73 N.E.3d 503, ¶ 32, 36. It follows that the deferential abuse-of-discretion standard is applicable to the arguments advanced regarding the experts.

**{¶ 56}** The need for considering those arguments, however, is obviated by the fact that the BTA's decision sets forth extensive analysis in support of its conclusions without relying on evidence offered by either expert. When "nothing in the BTA's decision" indicates that exhibits "were given any weight," we have held that "any error in admitting [the] exhibits" constitutes "harmless error." *Higbee Co. v. Cuyahoga Cty. Bd. of Revision*, 107 Ohio St.3d 325, 2006-Ohio-2, 839 N.E.2d 385, ¶ 30. The same is true regarding the experts' opinions and testimony here, and we accordingly find no merit to the arguments.

## CONCLUSION

**{¶ 57}** For the foregoing reasons, we affirm the decision of the BTA.

Decision affirmed.

O'CONNOR, C.J., and O'DONNELL, KENNEDY, FRENCH, O'NEILL, FISCHER, and DEWINE, JJ., concur.

_____

Corsaro & Associates Co., L.P.A., Joseph G. Corsaro, Christian M. Bates, Steven B. Beranek, and Scott R. Poe, for appellee and cross-appellant.

Michael DeWine, Attorney General, and Daniel W. Fausey, Assistant Attorney General, for appellant and cross-appellee.

_____