[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Cincinnati Reds, L.L.C. v. Testa,* Slip Opinion No. 2018-Ohio-4669.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-4669

CINCINNATI REDS, L.L.C., APPELLANT, *v.* TESTA, TAX COMMR., APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Cincinnati Reds, L.L.C. v. Testa,* Slip Opinion No. 2018-Ohio-4669.]

*Taxation—Use tax—Sale-for-resale exemption, R.C. 5739.01(E)—Promotional items distributed at professional baseball games were transferred with the purpose to "resell" them for consideration and therefore qualified for tax exemption—Decision of Board of Tax Appeals reversed and cause remanded.*

(No. 2017-0854—Submitted June 13, 2018—Decided November 21, 2018.)

APPEAL from the Board of Tax Appeals, No. 2015-1707.

_____

**FISCHER, J.**

{¶ 1} It would be an understatement to say that baseball has changed in dramatic ways since, as Justice Harry Blackmun wrote, the "Cincinnati Red Stockings came into existence in 1869 upon an outpouring of local pride," *Flood v.*

*Kuhn*, 407 U.S. 258, 261, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972). From the 1890s, when National Baseball Hall of Fame legend and Newcomerstown, Ohio's own Cy Young starred for the Cleveland Spiders; through the 1920s, when Judge Kenesaw Mountain Landis, a native of Milville, Ohio, and a Hall of Famer, strove as Major League Baseball's first commissioner to maintain the integrity of the game following the notorious Black Sox scandal; through the 1940s, when player-manager and Hall of Famer Lou Boudreau guided the Cleveland Indians to a World Series championship and was the American League's Most Valuable Player ("MVP") in 1948; through the 1950s and 1960s, when Hall of Fame manager Walter Alston of Venice, Ohio, and Miami University won four World Series titles with the Brooklyn and Los Angeles Dodgers; through the Big Red Machine era of the 1970s; through the 1980s, when Dayton, Ohio, native, Ohio University alumnus, and Hall of Famer Mike Schmidt won three National League MVP Awards and was named World Series MVP in 1980 for the Philadelphia Phillies; and into the 1990s, when Cincinnati's homegrown Hall of Famer Barry Larkin led the Reds to a World Series Championship, professional baseball has seen the creation of the American League in 1900, the creation of the World Series in 1903, the first radio broadcast of a game in 1921, the first night game at Crosley Field in Cincinnati in 1935, the breaking of the color barrier by Jackie Robinson (in the National League) and Larry Doby (for the Indians in the American League), the first televised World Series in 1947, the establishment of the designated hitter in 1973, and the cancellation of the World Series due to a player strike in 1994. *See Cy Young*, available at https://www.baseball-reference.com /players/y/youngcy01.shtml (accessed Oct. 25, 2018); *Kenesaw Mountain Landis*, available at http://mlb.mlb.com/mlb/history/mlb_history_people.jsp ?story=com_bio_1 (accessed Oct. 25, 2018); *Lou Boudreau*, available at https://baseballhall.org/hall-of-famers/boudreau-lou (accessed Oct. 25, 2018); *Walter Alston*, available at https://www.baseball-reference.com

2

/managers/alstowa01.shtml (accessed Oct. 25, 2018); *Mike Schmidt*, available at https://baseballhall.org/hall-of-famers/schmidt-mike (accessed Oct. 25, 2018); *Barry Larkin*, available at https://baseballhall.org/hall-of-famers/larkin-barry (accessed Oct. 25, 2018); *Timeline*, available at https://www.pbs.org /kenburns/baseball/timeline/ (accessed Oct. 25, 2018); *see also Flood* at 260-264.

{¶ 2} At one time, the emphasis in professional baseball was on the game, as succinctly put in the title of the documentary series covering pre-1960s Major League Baseball that was created by a national cable network, HBO: "When It Was a Game." *See* Richard Sandomir, *Old Color Clips Reborn in HBO Documentary*, New York Times (June 21, 1991) B12, available at https://www.nytimes.com/1991/06/21/sports/tv-sports-baseball-old-color-clips-reborn-in-hbo-documentary.html (accessed Oct. 25, 2018). In the early days, professional baseball was a business, but the game itself was the focus of that business, as explained by Justice Oliver Wendell Holmes Jr. in 1922: "The business is giving exhibitions of base ball." *Fed. Baseball Club of Baltimore, Inc. v. Natl. League of Professional Baseball Clubs*, 259 U.S. 200, 208, 42 S.Ct. 465, 66 L.Ed. 989 (1922).

{¶ 3} In *Fed. Baseball*, the court held that the business of professional baseball did not constitute interstate commerce and was not subject to antitrust law. *Id.* at 207-209. The court reaffirmed the holding of *Fed. Baseball* when it upheld Major League Baseball's reserve clause (which permitted a team to retain the rights to a player even after the player's contract had expired) in *Flood*. *Flood* at 284. Despite noting that the antitrust exemption for Major League Baseball was "an exception and an anomaly," *id.* at 282, the court concluded that any change to the exemption would need to be made by Congress, *id.* at 285. Following *Flood*, however, player free agency was established in Major League Baseball through arbitration and collective bargaining, and players' salaries increased significantly as league revenues grew. Noah Goodman, *The Evolution and Decline of Free*

*Agency in Major League Baseball: How the 2012-2016 Collective Bargaining Agreement Is Restraining Trade*, 23 Sports Lawyers J. 19, 20-21, 37-39 (2016).

{¶ 4} Along with increasing revenues and salaries, other factors have contributed to the transformation of professional baseball into something more than just a game. Faced with rising ticket prices and increasing entertainment options, Major League Baseball has experienced challenges in getting fans to attend games. *See* Mark Koba, *Keeping Fans in the Stands Is Getting Harder to Do*, https://www.cnbc.com/id/100886843 (accessed Oct. 25, 2018). Baseball organizations have thus become increasingly creative in finding ways to entice fans to attend games, turning stadiums into "mini theme parks" featuring additional attractions such as fireworks, concerts, and expanded dining options. *Id.* One such enticement is the opportunity to receive unique merchandise—such as bobbleheads, shirts, blankets, caps, player cards, tote bags, magnetic schedules, photographs, and bats—that can be obtained only by attending a game. This merchandise, commonly known as "promotional items," is the subject of this appeal.

{¶ 5} In this case, we are asked to consider how state tax law applies to the purchase of those promotional items by appellant, Cincinnati Reds, L.L.C. ("the Reds"). More specifically, the question before us is whether the sale-for-resale exemption of R.C. 5739.01(E) precludes the Reds from having to pay use tax on those promotional items. For the reasons explained below, we conclude that the exemption applies in this case. Thus, in the familiar words of Marty Brennaman, longtime Reds radio announcer and recipient of the National Baseball Hall of Fame's Ford C. Frick Award, we determine that "this one belongs to the Reds." We accordingly reverse the decision of the Board of Tax Appeals ("BTA").

## I. FACTUAL BACKGROUND

{¶ 6} Appellee, the tax commissioner, conducted a use-tax audit of the Reds' purchases over the period January 1, 2008, through December 31, 2010. The

portion of the audit at issue in this appeal concerns the Reds' purchase of promotional items.

**{¶ 7}** At the BTA hearing, the Reds' chief financial officer, Doug Healy, testified that the purpose of distributing promotional items is to drive ticket revenue at games that would otherwise be attended by fewer fans. He testified that the increased ticket revenue more than offsets the cost of promotional items distributed—"[o]therwise we wouldn't do it." Healy said that the Reds decide prior to the season which games might otherwise have low attendance and therefore could most benefit from the team's distribution of promotional items.

**{¶ 8}** Healy testified that the Reds advertise in advance that specific promotional items will be distributed at particular games, using media such as radio, television, billboards, and fliers. Items sold in the Reds' "fan shop" are similar to, but not the same as, the promotional items distributed to ticketholders at games, which are otherwise unavailable to the general public.

**{¶ 9}** The cost of promotional items is not separately stated from ticket prices, nor do ticket prices vary in accordance with whether promotional items are offered at a particular game. But ticket prices overall are set to cover the cost of promotional items along with other overhead associated with holding them as inventory and distributing them. Thus, the price of tickets to a particular game does not specifically reflect the items distributed at that game; the Reds try to, according to Healy, "smooth [the] ticket prices throughout the year."

**{¶ 10}** The tickets themselves do not state or include any guarantee regarding promotional items. However, Healy testified that fans who purchase tickets to games at which promotional items are offered "[a]bsolutely" believe that they are purchasing both the promotional item and the right to view the game at the ballpark. He said that fans expect and feel entitled to receive the promotional items, and he explained that it would be a "public relations nightmare" if the Reds reneged on the commitment to distribute them. The uncontradicted record indicates that the

Reds do not purposely underorder promotional items but instead estimate the amount of promotional items needed for a particular game based upon the projected attendance for that game. In the event that the Reds run out of any given promotional item, Healy testified that the Reds "will remedy it." He acknowledged that in these instances, the Reds may not be able to provide exactly the same promotional item, but he said that the Reds would "make it right" in ways such as giving another promotional item or complimentary tickets to fans who had failed to receive the designated items.

{¶ 11} The tax commissioner in his final determination concluded that "there is no evidence that the promotional items were resold with the admission to the games." The tax commissioner accordingly denied the Reds' request to remove the promotional items from the use-tax assessment.

{¶ 12} In affirming the decision of the tax commissioner, the BTA similarly found that "the promotional items * * * were given away for free, primarily to increase interest in certain targeted games or generally increase interest among a broader audience." BTA No. 2015-1707, 2017 WL 2324085, *2 (May 22, 2017). The BTA, despite the uncontradicted record evidence to the contrary, also stated that "the cost of the subject promotional items is not included in the ticket price," in the sense that "the ticket price for each particular seat is the same throughout an entire season regardless of whether a promotional item is being offered." *Id*. The BTA further stated that

> at the time they purchased their tickets, the Reds' patrons were not charged a separate, distinct amount for the promotional items given away. Moreover, a patron became eligible to receive a promotional item only after that game's ticket was purchased. Patrons paid the same amount for game tickets on promotional item giveaway days, even if they did not actually receive a promotional item, i.e., they

chose not to take the item upon entrance to the game, or they failed to receive an item because the supply ran out. Finally, the Reds' advertising confirmed that patrons were not being charged a separate amount for the items, clearly providing that the promotional items were "free," or a "giveaway."

*Id.* at *3.

{¶ 13} In their appeal, the Reds set forth two propositions of law:

1. When there is a transfer of valuable property to induce the purchase of another item, the consideration paid is for both the property and the other item. A separately stated price for the property is unnecessary to establish it was transferred for consideration.

2. The Board of Tax Appeals' decision is unreasonable and unlawful because material findings made by the Board are not supported by any reliable and probative evidence.

## II. ANALYSIS

{¶ 14} Pursuant to R.C. 5741.02(C)(2) as relevant here, use tax does not apply to "tangible personal property or services, the acquisition of which, if made in Ohio, would be a sale not subject to the tax imposed by sections 5739.01 to 5739.31 of the Revised Code." It follows that if the promotional items are not subject to sales tax pursuant to R.C. 5739.01 through 5739.31, then the Reds do not owe use tax for those items. Thus, the controlling statutory provisions in this case are under R.C. Chapter 5739, the sales-tax chapter of the Revised Code. *See Procter & Gamble Co. v. Lindley*, 17 Ohio St.3d 71, 73, 477 N.E.2d 1109 (1985) (observing that the court need only focus on the relevant sales-tax provisions

because use tax will not apply when the acquisition of property would be exempt from sales tax).

{¶ 15} One main feature of the sales and use taxes is the legislative intent to limit imposition of the tax to retail transactions, while excluding or exempting from the tax earlier transactions that are not retail transactions but rather are at the production or wholesale levels. Therefore, the starting point in cases like this often is the statutory definition of "retail sale." R.C. 5739.01(E) defines "retail sale" as "*all sales, except those in which the purpose of the consumer is to resell* the thing transferred or benefit of the service provided, by a person engaging in business, in the form in which the same is, or is to be, received by the person." (Emphasis added.) It is undisputed that the Reds purchased the promotional items from their suppliers and thereby became a "consumer" under the sales-tax and use-tax laws. *See* R.C. 5739.01(D)(1); R.C. 5741.01(F) (a "consumer" is "any person who has purchased tangible personal property"); *see also* R.C. 5739.03(A); R.C. 5741.02(B) ("Each consumer * * * shall be liable for the tax"). Thus, the question in this case is whether the Reds purchased the promotional items for the purpose of reselling them.

{¶ 16} The Reds, as purchaser of the promotional items, can have the purpose to "resell" under R.C. 5739.01(E) only if the club intends to make "sales" of the items. "Sale" is defined in R.C. 5739.01(B)(1) to include "[a]ll transactions by which title or possession, or both, of tangible personal property, is or is to be transferred, or a license to use or consume tangible personal property is or is to be granted," but this definition applies only if those "transactions [are] for a consideration," R.C. 5739.01(B). R.C. 5739.02(C) establishes the sales-tax presumption that "all sales made in this state are subject to the tax until the contrary is established," and R.C. 5741.02(G) carries that presumption over to the use tax. The Reds accordingly had the burden to prove that they purchased promotional items for the purpose of reselling them to fans.

{¶ 17} Consideration, in the contract-law sense, is important here: the question whether the Reds purchased promotional items for resale entails asking whether fans furnished consideration for the Reds' promise to hand out the promotional items at the games.

## A. The Only Evidence in the Record Shows the Existence of Consideration

{¶ 18} The BTA decided this case based on its finding that given all the circumstances, the Reds intended to give away promotional items for free rather than to sell them. The Reds contest this finding, arguing that they resell the promotional items by promising to distribute them. The Reds argue that this promise creates a contractual expectation on the part of the fans, who purchase tickets and attend the games as consideration for receiving the unique promotional items.

{¶ 19} This court has treated the question whether there is a "purpose * * * to resell" under R.C. 5739.01(E) as an issue of intent to be determined in light of attendant facts and circumstances, with the taxpayer who claims sale-for-resale exclusion bearing the burden to prove its actual intent to resell. *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 25-31. Based on the record before us, we agree with the Reds' second proposition of law and determine that the BTA's finding that the Reds intended to give away promotional items rather than to sell them is not supported by any reliable and probative evidence found in the record—in fact, the evidence in the record is to the contrary—and is therefore unreasonable and unlawful.

{¶ 20} "[W]hether there is consideration at all is a proper question for a court." *Williams v. Ormsby*, 131 Ohio St.3d 427, 2012-Ohio-690, 966 N.E.2d 255, ¶ 17. Although courts generally do not inquire into the adequacy of consideration if consideration is found to exist, courts must determine " 'whether any "consideration" was really bargained for.' " *Id.*, quoting *Carlisle v. T & R Excavating, Inc.*, 123 Ohio App.3d 277, 283-284, 704 N.E.2d 39 (9th Dist.1997).

**{¶ 21}** Healy's unrefuted testimony indicates that in the specific circumstances here, fans gave consideration in exchange for promotional items. He explained that the Reds advertise in advance to notify fans when specific promotional items will be distributed. Fans then purchase tickets to those specific games with the expectation that they will receive a promotional item. The Reds attempt to purchase enough promotional items so that one will be available for each fan. Healy offered undisputed testimony that in the event that the Reds do not have enough promotional items to provide one to each fan, the Reds would provide something of equivalent value, such as a different promotional item or a ticket to a future game.

**{¶ 22}** In determining that no consideration was given by fans in exchange for the promotional items, the tax commissioner and BTA focused on their findings that fans pay the same price to attend a game regardless of whether a promotional item is offered and that the cost of the promotional item is not included in the ticket price. But Healy specifically testified that the costs of promotional items are included in ticket prices when they are set before the start of a season and that promotional items are distributed at less desirable games for which tickets are not expected to be sold out. Thus, rather than offering discounted ticket prices to these less desirable games, it stands to reason that by including the cost of the promotional item in the ticket price, one portion of the ticket price accounts for the right to attend the less desirable game and a separate portion of the ticket price accounts for the right to receive the promotional item. Based on this record, we accordingly conclude that the promotional items constituted things of value in exchange for which fans paid money that was included in the ticket prices.

**{¶ 23}** Notably, the promotional items at issue in this case are distinct from unexpected, gratuitous items that fans might receive when attending a game. For instance, a fan might catch and bring home a foul ball hit by a player or a t-shirt tossed into the stands. In these instances, the fan had no expectation of receiving

the item and did not purchase a ticket under the assumption that the item would be provided by the team.

{¶ 24} In the present case, fans did not receive the promotional items unexpectedly or by chance. Instead, the unique promotional items were an explicit part of the bargain, along with the right to attend the game, that the fans obtained in exchange for paying the ticket fee. We therefore conclude that the fans furnished consideration for the Reds' promise to hand out these types of promotional items at the games and that the Reds met their burden to prove that they purchased promotional items for the purpose of reselling them to fans.

{¶ 25} While our conclusion may be viewed as exposing a "loophole" by which sports organizations can avoid paying use tax on promotional items, we emphasize that our interpretation is compelled by the application of R.C. Chapter 5739 to the specific facts in the record in this case. If the General Assembly prefers that sports organizations pay use tax on promotional items under the circumstances presented here, it can amend the Revised Code to require them to do so.

**B. Application of the Sale-for-Resale Exemption in this Case Is Consistent with *Hyatt Corp. v. Limbach***

{¶ 26} In arguing that the promotional items were not resold pursuant to R.C. 5739.01(E) because the Reds did not make a taxable "sale" of the promotional items, the tax commissioner relies on *Hyatt Corp. v. Limbach*, 69 Ohio St.3d 537, 634 N.E.2d 995 (1994). Given the factual differences between this case and *Hyatt Corp.*, we conclude that *Hyatt Corp.* does not support the tax commissioner's argument and instead accords with our conclusion that the promotional items are subject to the sale-for-resale exemption of R.C. 5739.01(E).

{¶ 27} In *Hyatt Corp.*, a hotel operator that paid cleaning companies to launder the linens it supplied to its guests argued that the linen-cleaning service was resold to its guests and therefore did not qualify as a "retail sale" pursuant to R.C. 5739.01(E). *Id.* at 539. This court concluded that although the sale-for-resale

exemption applied in situations involving transient guests, the exemption did not apply in situations involving long-term guests. *Id.* at 540.

{¶ 28} At the time of the court's decision in *Hyatt Corp.*, a transaction by which industrial laundry-cleaning service was provided constituted a "sale" pursuant to former R.C. 5739.01(B)(3)(d), Am.Sub.H.B. No. 152, 145 Ohio Laws, Part II, 3341, Part III, 4287. The court did not rely on that statute, however, and its decision was instead premised on R.C. 5739.01(B)(2), which specifies that the definition of "sale" includes "[a]ll transactions by which lodging by a hotel is or is to be furnished to transient guests."

{¶ 29} The court explained that "[i]n a lodging transaction, the hotel transfers a full sleeping room to its guest. This transfer includes the use of linens to sleep on and to wash with." *Hyatt Corp.*, 69 Ohio St.3d at 540, 634 N.E.2d 995. Because hotel guests bargained solely for lodging, rather than lodging plus a specific linen-cleaning service, the court focused on R.C. 5739.01(B)(2), which addresses lodging transactions, rather than former R.C. 5739.01(B)(3)(d), which addressed industrial laundry-cleaning-service transactions.

{¶ 30} Because linen-cleaning service is a transaction by which lodging by a hotel is furnished to a guest pursuant to R.C. 5739.01(B)(2), it follows that this service is part of a sale in situations involving transient guests. The furnishing of lodging to long-term guests, however, falls outside of the scope of R.C. 5739.01(B)(2) by virtue of R.C. 5739.01(N), which defines "transient guests" as "persons occupying a room or rooms for sleeping accommodations for less than thirty consecutive days." This means that because furnishing lodging to long-term guests is not a part of a "sale" under R.C. 5739.01(B)(2)—and is thus not something that can be resold—the sale-for-resale exemption could not apply to linen-cleaning service provided to long-term guests. As this court explained in *Hyatt Corp.*, "Under the statutes, renting these rooms is not a sale because lodging is not sold to

a transient guest, and consequently, the cleaning service is not resold. Accordingly, this linen cleaning transaction is not excepted." *Hyatt Corp.* at 540.

**{¶ 31}** As the tax commissioner points out, like the furnishing of lodging to long-term guests, the sale of game tickets falls outside the definition of "sale" under R.C. 5739.01(B). This does not mean that *Hyatt Corp.* controls in this case, however. In *Hyatt Corp.*, the court treated former R.C. 5739.01(B)(3)(d) as inapplicable, and whether the linen-cleaning service was taxable depended on whether the service was a transaction by which lodging by a hotel was furnished to transient guests pursuant to R.C. 5739.01(B)(2). If the service was a feature of lodging provided to a transient guest, it was part of a "sale." If the service was a feature of lodging provided to a long-term guest, however, it was not part of a "sale." Thus, in *Hyatt Corp.*, whether the linen-cleaning service was taxable depended on the nature of the lodging.

**{¶ 32}** In this case, however, whether the promotional items are taxable does not depend on whether selling tickets constitutes a "sale." This is so because transactions involving promotional items are "sales" in and of themselves pursuant to R.C. 5739.01(B)(1), which provides that "[a]ll transactions by which title or possession, or both, of tangible personal property, is or is to be transferred" are "sales." As we have noted above, the promotional items were an explicit part of the bargain, along with the right to attend the game, that the fans obtained in exchange for paying the ticket fee. This is in distinct contrast to *Hyatt Corp.*, in which this court found that the linen-cleaning service was not a separate and explicit part of the bargain by which lodging was provided. If it had found otherwise, the court would have applied former R.C. 5739.01(B)(3)(d) and treated the linen-cleaning service as a separate transaction that constituted a "sale" pursuant to that statutory provision. We accordingly conclude that *Hyatt Corp.* does not support the tax commissioner's argument.

### C. R.C. 5739.02(B)(35)(a) Is Not Affected by Our Conclusion

{¶ 33} The tax commissioner also argues that treating the promotional items in this case as purchases for resale effectively nullifies R.C. 5739.02(B)(35)(a), which exempts from sales tax those items that are purchased with the intention of using them to facilitate retail sales. R.C. 5739.02(B)(35)(a) states that the sales covered by its terms "consist[] of newspaper inserts, catalogues, coupons, flyers, gift certificates, or other advertising material that prices and describes tangible personal property offered for retail sale." The tax commissioner argues that because that list does not include items like the promotional items at issue in this case, the General Assembly must have intended that the promotional items in this case be subject to taxation.

{¶ 34} However, the mere fact that an exemption exists for one category of promotional items does not mean that all other promotional items are subject to taxation. We have explained that the promotional items here are not subject to sales tax under R.C. 5739.01(E) because they were bought by the Reds for the purpose of reselling them. Because the Reds' purchase of the promotional items did not constitute a "retail sale" under R.C. 5739.01(E), the provisions of R.C. 5739.02— which apply only to retail sales—are irrelevant in this case. We accordingly reject the tax commissioner's argument that our conclusion in this case effectively nullifies R.C. 5739.02(B)(35)(a).

### III. CONCLUSION

{¶ 35} Echoing a phrase often used by the person who was the youngest-ever Major League Baseball player, a longtime Reds player and radio commentator, and a native of Hamilton, Ohio, Joe Nuxhall, having completed our analysis, we are now "rounding third and heading for home."

{¶ 36} Because the specific evidence in the record establishes that fans who purchase tickets to Reds games at which unique promotional items will be distributed do so with the expectation that they will receive those promotional

14

items, we conclude that consideration is given in exchange for the Reds' agreement to supply fans with those promotional items. The transfer of promotional items to fans thus constitutes a "sale" pursuant to R.C. 5739.01(B)(1), and the promotional items are subject to the sale-for-resale exemption of R.C. 5739.01(E). We accordingly conclude that the Reds are not liable for use tax on the promotional items pursuant to R.C. 5741.02.

{¶ 37} We note that this opinion focuses on the sole issue in the case as identified by the Reds: whether the Reds received consideration from fans in exchange for the promotional items so that those items qualified for the sale-for-resale exemption of R.C. 5739.01(E). We do not reach any conclusions on issues not before us in this appeal, and we reverse the BTA's decision.

*Decision reversed.*

FRENCH, J., concurs.

O'CONNOR, C.J., and O'DONNELL and KENNEDY, JJ., concur in judgment only.

DEGENARO, J., dissents, with an opinion joined by MAYLE, J.

CHRISTINE E. MAYLE, J., of the Sixth District Court of Appeals, sitting for DEWINE, J.

_____

**DEGENARO, J., dissenting**.

{¶ 38} I respectfully dissent from the judgment of a majority of this court to reverse the decision of the Board of Tax Appeals ("BTA"). The lead opinion reasons that because the promotional items purchased and distributed by appellant, Cincinnati Reds, L.L.C. ("the Reds"), were a separate and "explicit part of the bargain" when baseball fans purchased certain game tickets, the Reds acquired those items for the purpose of "reselling" them to the ticket purchasers and, consequently, that the Reds are not obligated to pay use tax on those items. Lead opinion at ¶ 24; *see also id.* at ¶ 32. I disagree. Because the ticket sales themselves

are not taxed, the effect of reversing the decision of the BTA is to relieve the Reds' acquisition and transfer of the promotional items—which are tangible personal property—of *any* sales- or use-tax obligation, despite the fact that the sales tax and the use tax generally apply to such transactions. *See* R.C. 5739.01(B)(1) (for purposes of the sales tax, "sale" generally includes all transactions transferring title or possession of tangible personal property for consideration); R.C. 5741.02(B) (each consumer who uses tangible personal property in the state generally must pay use tax). In my view, the evidence presented in this case and the applicable law dictate the opposite result.

**Legal Framework**

{¶ 39} A consumer who has purchased tangible, personal property for storage, use, or other consumption in Ohio generally must pay use tax. S*ee* R.C. 5741.02(A)(1); R.C. 5741.02(B). Subject to an exception that is not relevant here, the use tax does not apply to the use of "tangible personal property or services, the acquisition of which, if made in Ohio, would be a sale not subject to the tax imposed by sections 5739.01 to 5739.31 of the Revised Code." R.C. 5741.02(C)(2). In other words, items that are exempt from sales tax are also generally exempt from use tax. Accordingly, although this case involves a use-tax assessment, we focus on the provisions of R.C. Chapter 5739, the sales-tax chapter of the Revised Code. *See Procter & Gamble Co. v. Lindley*, 17 Ohio St.3d 71, 73, 477 N.E.2d 1109 (1985).

{¶ 40} Relevant here, pursuant to R.C. 5739.01(E), the definition of "retail sale" does not include those sales "in which the purpose of the consumer is to resell the thing transferred or benefit of the service provided." And in order for a transaction to constitute a "sale," it must be "for a consideration." R.C. 5739.01(B).

{¶ 41} The main issue in this case is whether the sale-for-resale exception of R.C. 5739.01(E) relieves the Reds from having to pay use tax on promotional items, such as bobbleheads, that they distribute at games.

**The BTA's Factual Findings Should Be Afforded Deference**

{¶ 42} My principal point of disagreement lies with the lead opinion's determination that the BTA's finding that the Reds intended to give away promotional items rather than to sell them "is not supported by *any* reliable and probative evidence found in the record" (emphasis added) and that the BTA's decision is therefore "unreasonable and unlawful." Lead opinion at ¶ 19. In the same vein, I disagree with the lead opinion's conclusion that the evidence unequivocally establishes that fans gave consideration in exchange for the promotional items.

{¶ 43} In the BTA proceedings, the Reds bore the burden to demonstrate that they intended to resell the promotional items. *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 27; R.C. 5739.02(C) (all sales are presumed taxable "until the contrary is established"); R.C. 5741.02(G) (the same presumption applies regarding use tax). The BTA concluded that the Reds failed to meet this burden. We must affirm the BTA's factual findings " 'if they are supported by reliable and probative evidence, and we afford deference to the BTA's determination of the credibility of witnesses and its weighing of the evidence subject only to an abuse-of-discretion review on appeal.' " *Accel, Inc. v. Testa*, 152 Ohio St.3d 262, 2017-Ohio-8798, 95 N.E.3d 345, ¶ 16, quoting *HealthSouth Corp. v. Testa*, 132 Ohio St.3d 55, 2012-Ohio-1871, 969 N.E.2d 232, ¶ 10.

{¶ 44} Here, the evidence demonstrates that the Reds' pregame advertising often stated that such items were available as a "giveaway," that they would be distributed for "free," and that quantities were limited (e.g., "Free to the first 20,000 fans in attendance"). The game tickets contained no written guarantees that fans who bought tickets would receive the promotional items. The Reds' chief financial officer ("CFO") testified at the BTA hearing that the Reds provided season-ticket holders greater "access to promotional items" by allowing them to enter the stadium 30 minutes earlier than single-game ticket holders. Evidence in the record shows

that on most promotional-item-giveaway days, *thousands* of fans—sometimes *more than 10,000*—did not receive the promotional item. According to the Reds' CFO, if a fan who did not receive an item complained, the Reds would "make accommodations" to remedy the situation. Typically, the Reds would provide a substitute promotional item to an aggrieved fan, but if a person complained enough, the Reds would refund the full ticket price.

{¶ 45} Moreover, although the Reds' CFO testified at the BTA hearing that "there's a real cost" associated with the promotional items that is "part of the admission," he also emphasized that advertising the promotional giveaways provided "an incremental ticket lift" that was important because the Reds "*are in the business of selling tickets*" (emphasis added)—in other words, the Reds were *not* in the business of reselling those promotional items but instead distributed them to promote ticket sales. And although—like any other overhead expense—the cost of promotional items was apparently built into ticket prices overall, the record clearly supports the BTA's finding that "the ticket price for each particular seat is the same * * *, regardless of whether a promotional item is being offered," BTA No. 2015-1707, 2017 WL 2324085, *2 (May 22, 2017). The Reds' CFO stated that the ticket prices for a particular game were not dependent on the Reds' providing promotional items at that game.

{¶ 46} Thus, the BTA was justified in concluding that the purchase of a game ticket constituted consideration for nothing more than the right to attend the baseball game and that the Reds were not reselling the promotional items by advertising and giving them away free of any charge beyond the price of the ticket—as the Reds' CFO testified, the Reds were "driv[ing] additional ticket attendance" by distributing the promotional items. Incentivizing paid attendance at the games does not—at least not *necessarily*, as the lead opinion contends—involve "reselling" the promotional items.

**{¶ 47}** I disagree with the lead opinion's conclusion that the ticket purchasers provided consideration for the promotional items. The lead opinion notes that the cost of promotional items was built into *all* ticket prices before the season, with no separate charge for the promotional item offered at a particular game, and it concludes that "by including the cost of the promotional item in the ticket price, one portion of the ticket price accounts for the right to attend the less desirable game and a separate portion of the ticket price accounts for the right to receive the promotional item." Lead opinion at ¶ 22. But that means that *every* ticket purchaser at every game helped pay for promotional items regardless of whether a promotional item was received—or was even offered—at a particular game, and that circumstance breaks the link between the payment of the ticket price and the offer of a promotional item.

**{¶ 48}** The facts that the Reds' CFO testified that the fans have "a certain level of expectation that they will receive the bobblehead" and that he answered "yes" to the Reds' counsel's assertion that the fans "feel entitled to the promotional items" are not dispositive of this consideration either. Insofar as the CFO was providing his opinion—unrefuted or not—about the subjective beliefs of third parties, the BTA could have reasonably discounted that testimony. Regardless, the CFO also later described the fans' "expectation" as simply being that the Reds would, in fact, distribute the number of promotional items advertised. That is, the CFO explained that "there is an expectation when we put it out to the marketplace that if we say we're going to have * * *, let's say 30,000 bobbleheads, that the Reds are going to have 30,000 bobbleheads" and that "there is an expectation, *especially if they arrive early*, that they're going to get a promotional item." (Emphasis added.)

**{¶ 49}** Under these circumstances, the BTA could lawfully conclude that the offer of the promotional items did not constitute a contractual obligation supported by the purchase of the tickets. Rather, the situation here was in the nature

of what courts have referred to as a "conditional gratuitous promise," *Williams v. Ormsby*, 131 Ohio St.3d 427, 2012-Ohio-690, 966 N.E.2d 255, ¶ 17, quoting *Carlisle v. T & R Excavating, Inc.*, 123 Ohio App.3d 277, 283, 704 N.E.2d 39 (9th Dist.1997) (" 'conditional gratuitous promises, which require the promisee to do something before the promised act or omission will take place, are not enforceable as contracts' "). Indeed, " '[a] written gratuitous promise, even if it evidences an intent by the promisor to be bound, is not a contract.' " *Id.*, quoting *Carlisle* at 283. Thus, the written materials announcing the limited availability of promotional items to ticket purchasers who attend a particular game do not as a matter of contract law establish a contract under which both sides furnish consideration.

{¶ 50} The lead opinion's interpretation of the evidence confuses the *business motive* of the Reds to provide promotional items that have already been promised with a *contractual obligation* to do so. The evidence demonstrates the former but does not establish the latter.

### *Hyatt Corp. v. Limbach* Is Apposite

{¶ 51} My second point of disagreement with the lead opinion lies in its attempt to distinguish our decision in *Hyatt Corp. v. Limbach*, 69 Ohio St.3d 537, 634 N.E.2d 995 (1994). In *Hyatt Corp.*, a hotel operator that contracted with third-party companies to launder the linens it supplied to its guests argued that the linen-cleaning service was resold to its guests and therefore did not qualify as a "retail sale" pursuant to R.C. 5739.01(E). *Id.* at 539. The hotel served two types of guests: transient and long-term. Pursuant to R.C. 5739.01(B)(2), lodging furnished to "transient guests" constitutes a sales-tax sale, but no provision makes the renting of rooms to long-term guests a taxable transaction. Accordingly, this court held that the sale-for-resale exception did not apply in situations involving long-term guests:

> The BTA correctly concluded that linen used in rooms rented to
> long-term guests was not resold. Under the statutes, renting these

rooms is not a sale because lodging is not sold to a transient guest, and, consequently, the cleaning service is not resold. Accordingly, this linen cleaning transaction is not excepted.

*Hyatt Corp.* at 540.

{¶ 52} Although the lead opinion concedes that the Reds' sale of game tickets—like the sale of lodging to the long-term guests in *Hyatt Corp.*—is not a sales-tax "sale," it nonetheless determines that *Hyatt Corp.* is inapposite because the evidence in this case reveals a specific bargain for the promotional items that was supposedly absent when hotel guests rented rooms and thereby received the benefit of clean sheets and linens in *Hyatt Corp.*

{¶ 53} However, I disagree with the lead opinion's conclusion that this court in *Hyatt Corp.* "found that the linen-cleaning service was not a separate and explicit part of the bargain by which lodging was provided," lead opinion at ¶ 32, and that *Hyatt Corp.* therefore is factually distinguishable from this case. In *Hyatt Corp.*, we explained that "[i]n a lodging transaction, the hotel transfers a full sleeping room to its guest. This transfer includes the use of linens to sleep on and to wash with." *Hyatt Corp.* at 540. As a distinct component of the room rental, "guests received the benefit of [the linen-cleaning] service in being able to use clean linen." *Id.*

{¶ 54} Contrary to the lead opinion's conclusion, *Hyatt Corp.*'s holding should apply to this case. Because providing long-term lodging for consideration was not a sales-tax sale, the hotel operator did not "resell" the benefit of cleaning service to those guests. By the same logic, the Reds did not resell the promotional items here, because the sale of game tickets was not a sales-tax sale. Consequently, the Reds should, by the same reasoning as that applied in *Hyatt Corp.*, be liable for use tax as the consumer of the promotional items based on the Reds' own purchase of them.

{¶ 55} In sum, the BTA's decision should be affirmed. The Reds offered and distributed the promotional items gratuitously; as a result, the Reds owed tax as the purchaser and the use-tax consumer of the items. Accordingly, I respectfully dissent.

MAYLE, J., concurs in the foregoing opinion.

_____

Buckingham, Doolittle & Burroughs, L.L.C., Steven A. Dimengo, and Richard B. Fry III, for appellant.

Michael DeWine, Attorney General, and Daniel W. Fausey and Kody R. Teaford, Assistant Attorneys General, for appellee.

_____