**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *NASCAR Holdings, Inc. v. McClain*, **Slip Opinion No. 2022-Ohio-4131.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-4131

NASCAR HOLDINGS, INC., APPELLANT, *v*. MCCLAIN, TAX COMMR., APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *NASCAR Holdings, Inc. v. McClain*, Slip Opinion No. 2022-Ohio-4131.]**

*Taxation—Commercial Activity Tax, R.C. 5751.01 et seq.—R.C. 5751.033(F)— Situsing—Ohio Tax Commissioner's assessments as to company's broadcast revenue, media revenue, licensing fees, and sponsorship fees reversed.*

(No. 2021-0578—Submitted January 25, 2022—Decided November 22, 2022.)

APPEAL from the Board of Tax Appeals, No. 2015-263.

_____

**DEWINE, J.**

{¶ 1} Millions of fans worldwide watched on television as rookie driver Austin Cindric crossed the finish line to win the 2022 Daytona 500.  Some of those viewers were in Ohio.  They were able to watch because NASCAR had sold the

broadcast rights to FOX Broadcasting Company and FOX had licensed those rights to local television stations, streaming services, and cable providers who made the race available to Ohio viewers. Beyond television, the NASCAR brand reaches Ohio in many ways. Ohioans buy NASCAR grill covers, they watch ads aired by companies that brag of being NASCAR's "official partner," and they visit the NASCAR.com website owned by Turner Broadcasting, to name just a few.

{¶ 2} In 2011, the Ohio Tax Commissioner suspected that NASCAR owed monies under Ohio's commercial-activity tax ("CAT"), R.C. 5751.01 et seq. The Ohio Department of Taxation conducted an audit and determined that NASCAR had improperly failed to pay the tax from 2005 to 2010 and owed the state over a half-million dollars in back taxes and penalties.

{¶ 3} In this appeal, NASCAR's holding company contests the bulk of that assessment. The question is whether Ohio may apply its CAT to a portion of the revenue NASCAR derived from nationwide contracts licensing the rights to use its intellectual property. The relevant statute allows Ohio to tax NASCAR's receipts from the rights to use its intellectual property "to the extent the receipts are based on the right to use the property in [Ohio]." R.C. 5751.033(F). Applying this language to the contracts at issue, we conclude that most of the tax assessment was unlawful.

## I. Background

### A. The commercial-activity tax

{¶ 4} The General Assembly enacted the CAT in 2005. Am.Sub.H.B. No. 66, 151 Ohio Laws, Part II, 2868. The idea was to make Ohio a more attractive place to do business by replacing the existing business-tax regime with "a broad-based, low rate business privilege tax measured by gross receipts." Ohio Department of Taxation, *Ohio Budget Bill (Fiscal Years 2006-07): Major Ohio Tax Law Changes* (June 29, 2005), available at https://tax.ohio.gov/static

/communications/information_releases/g200501.pdf#page=1 (accessed Aug. 10, 2022) [https://perma.cc/C9DG-DA4N].

{¶ 5} The CAT is imposed on "taxable gross receipts for the privilege of doing business in this state." R.C. 5751.02(A). "Gross receipts" are "the total amount realized, * * * without deduction for cost of goods sold or expenses incurred, that contributes to the production of gross income." R.C. 5751.01(F). In other words, instead of being imposed on a net income, the CAT is applied to all funds received from business transactions. *See* R.C. 5751.03.[1]

{¶ 6} The CAT law defines as "taxable gross receipts" only those receipts that are "gross receipts *sitused* to this state." (Emphasis supplied.) R.C. 5751.01(G). The amount of "gross receipts sitused to this state" is important for two reasons. First, gross receipts are used to determine whether a business is subject to the CAT; those subject to the CAT include businesses with a "substantial nexus" to Ohio. R.C. 5751.02. Among the ways a business can have a substantial nexus to Ohio is to have $500,000 of annual taxable gross receipts. R.C. 5751.01(H)(3) and (I)(3); *see Crutchfield Corp. v. Testa*, 151 Ohio St.3d 278, 2016-Ohio-7760, 88 N.E.3d 900, ¶ 5, 21. Second, gross receipts are used to determine *how much* tax is owed; liability is calculated by applying the base tax rate to "taxable gross receipts." R.C. 5751.02. The dispute in front of us boils down to whether certain receipts are properly sitused to Ohio.

{¶ 7} Receipts are sitused to Ohio according to taxable categories. *See* R.C. 5751.033. Relevant here, the situsing law provides that gross receipts from the right to use intellectual property "shall be sitused to [Ohio] to the extent that the receipts are based on the right to use the property in [Ohio]." R.C. 5751.033(F). A separate, catchall provision provides that "all other gross receipts not otherwise

---

1. The earliest versions of R.C. 5751.03 and the other Revised Code provisions imposing the CAT govern the audit period at issue. *See, e.g*., Am.Sub.H.B. No. 66, 151 Ohio Laws, Part III, 4143, 4707 (2005); 2009 Am.Sub.H.B. No. 1.

sitused under this section, shall be sitused to [Ohio] in the proportion that the purchaser's benefit in [Ohio] with respect to what was purchased bears to the purchaser's benefit everywhere with respect to what was purchased."  R.C. 5751.033(I).

## B.  NASCAR's presence in Ohio

{¶ 8} NASCAR is the preeminent sanctioning body of stock-car racing.  Its holding company, NASCAR Holdings, Inc., is headquartered in Daytona Beach, Florida.

{¶ 9} NASCAR races are held at over 100 racetracks across 39 states and Canada and are broadcast in over 150 countries.  During the audit period, NASCAR did not hold any of its premier Sprint Cup Series events in Ohio.  It did hold seven smaller events in Ohio—four Craftsman Truck Series races and three regional events.  NASCAR kept no permanent offices in Ohio, owned no property in Ohio, and employed no permanent workers in Ohio.  NASCAR was not registered for Ohio's commercial-activity tax.  NASCAR pays taxes on its commercial activities in Florida, except for some event-derived revenue that is taxed at the location of the event.

{¶ 10} In 2011, the Ohio Department of Taxation decided to audit NASCAR's commercial activity in Ohio for the period of July 1, 2005, through December 31, 2010 ("the audit period").  To conduct the audit, the department reviewed NASCAR's taxable gross receipts from the following revenue streams: broadcast revenue, media revenue, licensing fees, sponsorship fees, sanction fees, memberships, and competition.  The parties stipulated to sample agreements to serve as representative contracts for each category.  *See* R.C. 5751.09(G); Ohio Adm.Code 5703-29-03.  The categories are explained below.

{¶ 11} *Broadcast Revenue.*  NASCAR sold to FOX Broadcasting Company the rights to a set number of races over eight years.  FOX paid $1.664 billion for the right to broadcast these races in the United States, its territories, and sometimes

in Mexico, the Caribbean basin, and Canada. FOX had complete editorial control over the broadcasts. FOX entered into third-party agreements disseminating the television rights to local markets and home-television screens. These third-party agreements did not directly affect NASCAR's contract revenue.

{¶ 12} The tax commissioner sitused the broadcast revenue under the catchall provision. The commissioner determined that the provision requires gross receipts to be sitused to Ohio based on the proportion of the television audience that is located in Ohio. To approximate this number, the commissioner used Nielsen data on the total number of cable-TV households, broken down by state. The commissioner then apportioned receipts to Ohio based on the ratio of Ohio cable-TV households to all United States cable-TV households. For example, Nielsen reported that Ohioans made up 4.31254 percent of American cable-TV viewers in 2007, so the tax commissioner determined that the same percentage of NASCAR's broadcast revenue should be sitused to Ohio for that year.

{¶ 13} *Media Revenue*. NASCAR earned media revenue by licensing the right to use its brand in marketing efforts and the right to operate NASCAR's website. The sample agreement for this category granted Turner Broadcasting System, Inc., the exclusive right to operate the official NASCAR website and the nonexclusive right to use NASCAR's brand online. This included the right to create an online store, NASCAR fantasy games, and NASCAR-branded nonracing games. In consideration for those rights, which spanned the entire World Wide Web, Turner paid $6 million over six years.

{¶ 14} The commissioner sitused gross media receipts under the intellectual-property provision using the same methodology as for the broadcast revenue: the ratio of Ohio cable-TV households to United States cable-TV households. The final audit report lumped the broadcast and media revenues together for a total of $139,470,294 in taxable gross receipts over the audit period.

**{¶ 15}** *Licensing fees*. NASCAR earned fees by licensing the right to use its trademark and trade name to manufacturers, insurance companies, banks, food companies, and more. Under the sample agreement, the merchandising company, BSI Products, Inc., obtained the right to use the NASCAR logo on various products, including flags, barbeque sets, and keychains. BSI could sell its NASCAR-licensed products anywhere in "the United States of America, its territories and possessions, the Commonwealth of Puerto Rico, United States military bases abroad and Canada." BSI paid NASCAR an advance payment and royalties and provided a minimum annual guarantee. Using United States census data—taking Ohio's population as a proportion of the national population—the commissioner determined NASCAR's taxable gross receipts from licensing to be $10,230,588 over the audit period.

**{¶ 16}** *Sponsorship fees*. NASCAR collected fees from corporate sponsors. The sample agreement granted AFLAC, Inc., the exclusive right to advertise itself as NASCAR's supplemental-insurance partner in the United States. AFLAC agreed to pay NASCAR nearly $5.5 million over 3.5 years for the sponsorship. The commissioner again used Ohio's population as a proportion of the national population as a basis for the assessment, situsing to Ohio $26,123,178 of the sponsorship revenue over the audit period.

**{¶ 17}** *Sanction fees, memberships, and competition*. NASCAR has not challenged the assessment for the three remaining categories, which relate to the races held in Ohio. They are (1) taxable gross receipts from sanction fees paid by race promoters, totaling $341,470, (2) revenues sitused to Ohio from membership fees paid by competitors, track officials, and promotors to participate in sanctioned events, totaling $72,881, and (3) competition revenue from fees paid by participants at events, totaling $85,058. Together, these three categories amounted to roughly ¼ of 1 percent of NASCAR's purported taxable gross receipts over the audit period.

In contrast, according to NASCAR, broadcast revenue generated about 68 percent of its receipts during the audit period.

{¶ 18} The tax commissioner added the revenue streams together for a total of over $186,592,000 in taxable gross receipts over the audit period. The commissioner applied the tax rate to determine that NASCAR owed taxes in the amount of $328,739. Interest and penalties led to a final tax assessment of $549,520.

*C. NASCAR challenges the assessment*

{¶ 19} After the tax commissioner issued a final determination affirming the assessment, NASCAR sought review by the Board of Tax Appeals. The BTA initially dismissed the appeal on jurisdictional grounds. *See NASCAR Holdings, Inc. v. Testa*, 152 Ohio St.3d 405, 2017-Ohio-9118, 97 N.E.3d 414, ¶ 7. But this court reversed and remanded to the BTA to assess the merits of NASCAR's arguments. *Id.* at ¶ 19.

{¶ 20} The BTA affirmed the assessment. BTA No. 2015-263, 2021 Ohio Tax LEXIS 780 (Apr. 5, 2021). The BTA adopted NASCAR's argument that instead of the catchall provision, the intellectual-property provision should have been applied to the broadcast revenue. *Id.* at *6-7. But it determined that the assessment would have been the same under either situsing provision. *Id.* at *12-13. For all four revenue streams under review—broadcast, media, licensing, and sponsorship—the BTA determined that the receipts were properly sitused to Ohio because NASCAR's agreements conferred "the right to use the intellectual property in this state." *Id.* at *5-6, 8-9. The BTA rejected NASCAR's proposed methodology under which receipts from its agreements would be sitused to its corporate domicile, Florida. *Id.* at *8-9. And the BTA affirmed the commissioner's decision to not abate the penalty portion of the assessment. *Id.* at *3-4, 14.

{¶ 21} We now take up NASCAR's arguments on direct appeal. *See* R.C. 5717.04; S.Ct.Prac.R. 10.01.

## II. Analysis

{¶ 22} NASCAR challenges the bulk of the tax assessment, arguing that its broadcast revenue, media revenue, licensing revenue, and sponsorship revenue are not subject to the CAT. In its first proposition, NASCAR contends that the BTA erred by affirming the broadcast-revenue assessment on a different basis than that relied on by the tax commissioner. Second, NASCAR argues that the broadcast, media, licensing, and sponsorship revenues may not be sitused to Ohio under the CAT. Third, NASCAR maintains that the tax is unconstitutional as applied. Fourth, NASCAR argues that the BTA should have granted various motions. Finally, NASCAR challenges the penalties assessed.

{¶ 23} Our resolution of the first two propositions makes it unnecessary to address the others.

*A. The BTA may approve a tax assessment on alternative grounds*

{¶ 24} NASCAR's argument that the BTA erred by affirming the assessment of broadcast revenue based on a different statutory provision than the one originally relied on by the tax commissioner is a nonstarter.

{¶ 25} NASCAR's argument is centered on R.C. 5703.05(H). That provision states that "*the* [*tax*] *commissioner* shall not review, redetermine, or correct any tax assessment * * * which the commissioner has made as to which an appeal * * * has been filed with the board of tax appeals, unless such appeal * * * is withdrawn by the appellant * * * or dismissed." (Emphasis supplied.) R.C. 5703.05(H) prohibits the tax commissioner from modifying an assessment, not the BTA. Indeed, when a taxpayer appeals a final determination of the tax commissioner, the BTA has explicit statutory authority to "affirm, reverse, vacate, *modify*, or remand." (Emphasis supplied.) R.C. 5717.03(F). Thus, we have little difficulty rejecting NASCAR's argument.

{¶ 26} NASCAR's fallback argument—that "the tax commissioner shall not make or issue an assessment * * * after the expiration of ten years" from the

date the tax report was due, R.C. 5703.58(A)—fares no better. That provision limits the tax commissioner's ability to modify an assessment, not the BTA's. And the tax commissioner's assessment in this case was journalized in December 2012—well within the limitation period. We reject NASCAR's first proposition.

*B. Most of the tax assessment was based on receipts improperly sitused to Ohio*

**{¶ 27}** We next consider NASCAR's substantive challenges to the assessment. On this front, one of NASCAR's arguments is based on the tax code and the other is based on what the United States Supreme Court has called the "dormant" or "negative" part of the Interstate Commerce Clause of the United States Constitution, Article I, Section 8, cl. 3, *see Comptroller of the Treasury of Maryland v. Wynne*, 575 U.S. 542, 548-549, 135 S.Ct. 1787, 191 L.Ed.2d 813 (2015); *id.* at 572 (Scalia, J., dissenting). Prudence dictates that we consider the statutory argument first and the constitutional one only if necessary. In doing so, we give no deference to the BTA's "construction and application" of the tax statutes, *Progressive Plastics, Inc. v. Testa*, 133 Ohio St.3d 490, 2012-Ohio-4759, 979 N.E.2d 280, ¶ 15. Instead, we must independently interpret statutory provisions.

**{¶ 28}** NASCAR's gross receipts for broadcasting, media, licensing, and sponsorships were sitused to Ohio under R.C. 5751.033(F), which provides:

> Gross receipts from the sale, exchange, disposition, or other grant of the right to use trademarks, trade names, patents, copyrights, and similar intellectual property shall be sitused to this state to the extent that the receipts are based on the amount of use of the property in this state. If the receipts are not based on the amount of use of the property, but rather on the right to use the property, and the payor has the right to use the property in this state, then the receipts from the sale, exchange, disposition, or other grant of the

right to use such property shall be sitused to this state to the extent
the receipts are based on the right to use the property in this state.

{¶ 29} The BTA relied on the second sentence of this section in leveling the CAT for "the right to use" NASCAR's intellectual property in Ohio. BTA No. 2015-263, 2021 Ohio Tax LEXIS, at *6-9. That determination was correct. The sample agreements provided for fixed payments for the right to use NASCAR's intellectual property. The payments were contingent not on the *amount* of use but, rather, solely *on the right to use* the property. Thus, the tax commissioner properly looked to the second sentence, instead of the first sentence, of R.C. 5751.033(F).

{¶ 30} Under that sentence, receipts may be sitused to Ohio only "*to the extent*" that they "are *based on* the right to use the property in" Ohio. (Emphasis supplied.) And therein lies the problem. None of the sample contracts tied payments to the right to use property in Ohio. Ohio was not even mentioned in the contracts. Rather, the agreements granted broad rights to use NASCAR's intellectual property over large geographic areas—most often the United States and its territories—that include Ohio.

{¶ 31} Thus, there are no traceable receipts that are "based on" a right to use NASCAR's intellectual property "in this state." *Id.* One thing is "based on" another if the second thing is foundational to the first. "In common talk, the phrase 'based on' indicates a but-for causal relationship and thus a necessary logical condition." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007). But nothing in the contracts before us shows any causal connection between any of the receipts and the right to use NASCAR's intellectual property in Ohio.

{¶ 32} The phrase "to the extent that" is also problematic for the tax commissioner. "Extent" means "the range * * * over which something extends." *Webster's Third New International Dictionary* 805 (2002). So in saying that

receipts shall be sitused to Ohio "to the extent" that the receipts are based on the right to use property, the statute imposes a limit on the tax commissioner's authority. Intellectual-property receipts may be sitused to Ohio only in so much as—or to the extent that—they are "based on" the right to use the property in this state. But none of the contracts here bases payment to NASCAR on the right to use its property in Ohio.

{¶ 33} A look at each category illuminates the problems with the commissioner's reading of the law.

### 1. The broadcast revenue is not based on the right to use NASCAR's property in Ohio

{¶ 34} NASCAR granted FOX the right to transmit an audiovisual signal of its auto races to television screens anywhere in the United States and its territories and sometimes in Mexico and Canada. As NASCAR points out, the existence of a contractual right to use broadcast rights in a territory that includes Ohio does not mean that the gross receipts—or any portion of them—are "based on" the right to use them in Ohio. FOX paid NASCAR a fixed fee for the rights—a fee that is unchanged regardless of whether any part of NASCAR's intellectual property even makes it to Ohio.

{¶ 35} In opposition, the tax commissioner argues that under the statute, "receipts from the licensing of the right to use the intellectual property also were subject to tax, whether those rights were actually used by the purchaser or not, and the measure should reflect the value of the right to use them in Ohio." Essentially, the commissioner contends that even though the contract doesn't base payment on the right to use the property in Ohio, he can approximate what the Ohio portion of the rights are worth and impose the CAT on that basis.

{¶ 36} We decline to stretch the statutory language so far. By its plain terms, the CAT applies to the right to use intellectual property only to the extent that receipts are "based on" the right to use the property in Ohio. The sample

contract plainly does not base what NASCAR is paid on the right to use NASCAR's property in Ohio.

{¶ 37} In arguing otherwise, the tax commissioner focuses more on what he contends is the general principle underlying the CAT—to source receipts based on where the market for the sale is located—than on the actual statutory language. But our job is to apply the plain language of the statute. To the extent that the commissioner believes that the statutory language fails to adequately reflect the policies underlying the CAT, he is free to take up that matter with the legislature.

{¶ 38} We reverse the tax assessment with respect to NASCAR's gross receipts for broadcast revenue.

### 2. The media revenue, licensing fees, and sponsorship fees sitused to Ohio are not "based on the right to use" NASCAR's property in Ohio

{¶ 39} The commissioner's assessment for the remaining challenged categories stalls out for similar reasons.

{¶ 40} Begin with media revenue. This category includes "receipts from sponsors and other clients, including ESPN, FOX Sports, TNT, and Direct TV to incorporate NASCAR intellectual property into marketing efforts," revenue from production and media services, and proceeds from the deal with Turner Broadcasting to operate www.nascar.com. The representative contract is the multiyear agreement with Turner, which licenses the use of the NASCAR URL and other intellectual property on the Internet in return for a fixed annual fee. Nothing in the contract ties payments to the amount of use of NASCAR's intellectual property or to any right to use the property in Ohio.

{¶ 41} The tax commissioner sitused these revenues the same way as for the broadcast receipts, using the ratio of Ohio cable-TV households to United States cable-TV households. But R.C. 5751.033(F) does not authorize that action. The receipts at issue are fixed payments: they do not vary with the amount of use, and they are not based on the right to use the property in Ohio as opposed to elsewhere.

12

{¶ 42} Next up are sponsorship fees. The representative contract is NASCAR's agreement with AFLAC that defines the territory as the United States and requires AFLAC to pay fixed "annual rights fees." Here, the tax commissioner apportioned receipts based on the ratio of Ohio's population to the United States' population. But just as with the other categories, the sponsorship fees are fixed sums that do not vary with the amount of use of the intellectual property, nor is any payment tied to the right to use the property in Ohio as opposed to elsewhere.

{¶ 43} Finally, we come to the licensing fees. Under the representative contract, BSI pays royalties to NASCAR equal to a percentage of net sales of licensed products. BSI also commits to pay "minimum annual guarantees and advances." Neither the royalties nor the guarantees and advances are tied to the use of NASCAR's marks in any particular location. The tax commissioner sitused these receipts using the same method he used for the sponsorship fees: the ratio of Ohio's population to the United States' population.

{¶ 44} As we have seen with the other categories, the licensing-fee contract does not designate any payment to NASCAR for the right to use the marks in Ohio as opposed to elsewhere. Unlike the other categories of receipts, the licensing fees vary based on BSI's sales. Importantly, however, the tax commissioner predicates the assessment of all the receipts at issue, including the licensing fees, exclusively on the second sentence of R.C. 5751.033(F), not the first.

{¶ 45} The partial dissent maintains that the analysis should look different for licensing fees. The royalty fees, it argues, subject NASCAR to the first sentence of R.C. 5751.033(F), covering actual use. But the tax commissioner's final audit report emphasized that NASCAR's sample agreement with BSI "is based on a '**right to use**' the NASCAR logo on products." (Emphasis in original.) Thus, as with the rest of NASCAR's revenue streams, the tax commissioner levied the CAT for licensing fees based on BSI's right to use NASCAR's marks. The tax commissioner did not attempt to justify the assessment based on actual use; indeed,

he specifically distinguished actual use from the right to use. We will steer clear of new theories for taxability that were neither relied on by the tax commissioner nor argued by the parties.

{¶ 46} Accordingly, we conclude that the assessment for broadcast revenue, media revenue, sponsorship fees, and licensing fees did not lie within the tax commissioner's authority under R.C. 5751.033(F). We therefore reverse the BTA's decision upholding those assessments.

### C. *We need not address NASCAR's constitutional challenge or its requests to amend its complaint and conduct additional discovery*

{¶ 47} Our agreement with NASCAR's statutory argument obviates any need to address NASCAR's constitutional challenge to the CAT. For the same reason, we decline to address NASCAR's proposition seeking additional discovery and to amend its notice of appeal to raise additional constitutional arguments.

### D. *We defer consideration of NASCAR's challenge to the penalties imposed*

{¶ 48} NASCAR argues that even if the assessment was proper, the BTA erred by failing to abate the penalties that were imposed. The penalties were based on the total amount of tax owed, and our decision that most of the tax assessment was unlawful means that the bulk of the penalties assessed against NASCAR must be vacated by the commissioner on remand.

{¶ 49} In addition, our decision reduces NASCAR's taxable gross receipts from roughly $186,592,000 to $499,409 over the five-and-a-half-year period at issue. Though the issue is not in front of us, and we issue no decision on the matter, it is quite possible that the commissioner may determine on remand that NASCAR has no CAT liability for some or all of the tax periods at issue and that, relatedly, NASCAR had no duty to register and file returns for some or all of those periods. *See* R.C. 5751.01(H) and (I)(3) (providing that one way an entity is subject to the CAT is by having a "substantial nexus" to Ohio by way of a "bright-line presence" that arises from taxable gross receipts in a calendar year of at least $500,000); *see*

14

*also* R.C. 5751.03 (providing for various exclusions relating to the first $1 million of taxable gross receipts). Thus, the issue of penalty abatement may well become moot.

{¶ 50} In light of the uncertainty about what penalties, if any, NASCAR might be assessed on remand, we see no need to address that matter at this juncture. Instead, we remand to the tax commissioner to calculate, consistent with this opinion, the remaining CAT assessment, if any, on NASCAR for sanction fees, memberships, and competition during the audit period. *See Epic Aviation, L.L.C. v. Testa*, 149 Ohio St.3d 203, 2016-Ohio-3392, 74 N.E.3d 358, ¶ 37. Should the tax commissioner continue to assess taxes and penalties on remand, NASCAR may pursue an appeal, if appropriate, at that time.

### III. Conclusion

{¶ 51} We reverse the tax assessment as to NASCAR's broadcast revenue, media revenue, licensing fees, and sponsorship fees. We remand the matter to the tax commissioner to calculate the amount of principal tax and penalty, if any, that NASCAR owes after the amount of gross receipts subject to assessment is reduced in accordance with this opinion.

Decision reversed

and cause remanded.

O'CONNOR, C.J., and KENNEDY and FISCHER, JJ., concur.

STEWART, J., concurs in part and dissents in part, with an opinion joined by DONNELLY and BRUNNER, JJ.

—————————

**STEWART, J., concurring in part and dissenting in part.**

{¶ 52} I agree with the majority's conclusions on most of the issues in this tax appeal. I write separately, however, because I disagree with the majority's decision regarding the allocation of the licensing-fee receipts of appellant, NASCAR Holdings, Inc. ("NASCAR"), for taxation purposes. I would affirm the

Board of Tax Appeals' ("BTA's") decision affirming appellee the Ohio Tax Commissioner's assessment and allocation as to those receipts. *See* BTA No. 2015-263, 2021 Ohio Tax LEXIS 780 (Apr. 5, 2021).

{¶ 53} As the majority opinion notes, NASCAR contests the taxability of its gross receipts under four of the seven revenue categories reviewed by the tax commissioner: broadcast revenue, media revenue, licensing fees, and sponsorship fees. Specifically, NASCAR argues that R.C. 5751.033(F) does not subject any portion of those receipts to taxation under any methodology. NASCAR also argues that even if R.C. 5751.033(F) authorizes the imposition of taxes for the receipts, the provision does not authorize the methodologies employed by the tax commissioner and sanctioned by the BTA in this case. I agree with the majority opinion that R.C. 5751.033(F) does not apply to NASCAR's receipts from broadcast revenue, media revenue, and sponsorship fees. But in my view, the licensing-fee receipts are taxable under R.C. 5751.033(F).

## I. The evidence concerning the licensing-fee receipts

{¶ 54} Under the parties' stipulations, NASCAR's gross receipts for "license fees" "include income NASCAR received from trademark and trade name licenses issued to a wide range of companies that include, but are not limited to, manufacturers, insurance companies, banks, and food/beverage companies." A multiyear contract between NASCAR and BSI Products, Inc., was submitted as a stipulated exhibit that serves as an "exemplar agreement giving rise to [NASCAR's] License Fees receipts."

{¶ 55} The contract provides that BSI may use specified "Marks" owned by NASCAR in BSI's marketing of specified products such as flags, mugs, grill covers, key chains, hood ornaments, and fuzzy dice. Under the agreement, BSI pays royalties to NASCAR equal to a percentage of BSI's net sales of the licensed products. The royalties are not explicitly tied to BSI's use of that intellectual property at any particular location. BSI also commits under the agreement to

16

paying "minimum annual guarantees and advances" to the extent that the royalties may not measure up. The guarantees and advances are also not tied to the use of NASCAR's marks at any particular location.

{¶ 56} Concerning payments under the contract with BSI, NASCAR's finance director testified that "there's a minimum annual guarantee that the licensee pays per dollar of the amount of sales, and then depending on the actual sales and the actual royalties owed, there could be an additional payment above and beyond the minimum guarantee." In other words, the minimum annual guarantee is not a flat payment that is conceptually divorced from actual sales but rather a minimum royalty payment that may be increased depending on the sales.[2] Notably, NASCAR does not receive any records from BSI that identify where BSI sold the licensed products that underlie the royalty payments.

{¶ 57} To situs these receipts, the tax commissioner used the ratio of Ohio's population to the United States' population for the years at issue. The taxable gross receipts from licensing fees over the audit period amounted to $10,230,588.

## II. Statutory analysis regarding the licensing-fee receipts

*A. R.C. 5751.033(F) does not authorize the allocation of NASCAR's licensing-fee receipts to its Florida domicile*

{¶ 58} The starting point for determining the reasonableness and lawfulness of the BTA's decision affirming the tax commissioner's allocation of the licensing-fee receipts to Ohio is NASCAR's own position concerning the proper situs of those receipts. At the BTA hearing, NASCAR's finance director testified that NASCAR consistently sitused its intellectual-property receipts to NASCAR's domicile of Florida. The tax commissioner's auditors' remarks noted that NASCAR sitused

---

2. For purposes of determining situs, therefore, the minimum annual guarantee may properly be treated as an allocable royalty payment; if, however, NASCAR proved that a particular receipt consisted of a minimum payment not linked to any underlying sales, then the payment could be treated as a fixed payment that may not be sitused to Ohio under R.C. 5751.033.

"intangible income revenue streams * * * to Florida with the exception of the 'Sanction Agreement' receipts that are situsable to the location of the event."

{¶ 59} When prosecuting its petition for reassessment before the tax commissioner, NASCAR cited *Goodyear Tire & Rubber Co. v. Tracy*, 85 Ohio St.3d 615, 619, 710 N.E.2d 686 (1999), in support of its position that its receipts from intangible property should be sitused to its Florida domicile. In that case, this court stated, "The general theory of the taxation of intangibles is that they are taxed at the residence of the owner." Here, the tax commissioner correctly pointed out in his final determination that R.C. 5751.033 does not follow that rule. Because R.C. 5751.033(F) does not recognize a principle of situsing gross receipts to the taxpayer's domicile, NASCAR's situsing method for the licensing-fee receipts was not a lawful method of allocation for purposes of Ohio's commercial-activity tax ("CAT"), R.C. 5751.01 et seq.

{¶ 60} Here, it is useful to look at analogous provisions in other Ohio taxation provisions. As explained below, with regard to both Ohio's corporation franchise tax,[3] R.C. Chapter 5733, and Ohio's income tax on individuals and estates, R.C. Chapter 5747, at least some royalty income is allocated based on the geographic location of the intangible property's use—which means that, just like R.C. 5751.033(F) in this case, those provisions put the burden on the taxpayer to know where the licensee of intangible-property rights used those rights.

{¶ 61} This is especially true of the corporation franchise tax. R.C. 5733.051(G) provides that a corporation's "[n]et rents, net royalties, and net technical assistance fees from intangible property are allocable to this state to the extent that the activity of the payor thereof giving rise to the payment takes place

---

3. Although the corporation franchise tax has been phased out of operation, *see* 2012 Am.Sub.H.B. No. 510, the tax is still on the books. Indeed, R.C. 5751.033(H) refers to the corporation franchise tax in the context of prescribing the CAT situs for gross receipts from "dividends, interest, and other sources of income from financial instruments."

in this state" and that when "the location of a payor's activity is not available to the corporation, the net rents, net royalties, and net technical assistance fees are allocable or apportionable under [R.C. 5733.051(I)]." R.C. 5733.051(I) provides that such income "is allocated entirely to this state except to the extent the allocation of such item * * * entirely to this state is not within the taxing power of this state under the Constitution of the United States." In other words, if no reasonable break-out of royalty receipts can be determined for purposes of the corporation franchise tax, Ohio taxes all the royalty income to the extent that doing so is constitutionally permissible.

{¶ 62} Ohio's individual income tax takes a more mixed approach. R.C. 5747.20(B)(4) allocates patent and copyright royalties to Ohio "to the extent the patent or copyright was utilized by the payor in this state" and then defines more specifically what constitutes use of a patent or copyright in Ohio. However, unlike the corporation franchise tax and the CAT, the income tax allocates patent-royalty income to the taxpayer's domicile "[i]f the basis of receipts from [the patent or copyright] royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization," *id.* Beyond that, income from intangible property other than patents and copyrights—a category that would encompass the marks at issue in this case—would be allocated to the individual taxpayer's domicile under R.C. 5747.20(B)(6), which is the very result NASCAR seeks here.

{¶ 63} Viewed against this backdrop, the purpose of the first sentence of R.C. 5751.033(F) is to require that gross receipts be sitused to Ohio to the extent that the licensee/payor uses the licensed intangible-property rights in Ohio. And R.C. 5751.033 provides no fallback that authorizes NASCAR's approach of allocating those receipts to its domicile of Florida.

*B.  By basing NASCAR's receipts on a percentage of BSI's net sales, the licensing-fee contract triggers the first sentence of R.C. 5751.033(F)*

**{¶ 64}** Under the first sentence of R.C. 5751.033(F), the initial prerequisite for allocating any of the licensing-fee receipts to Ohio is a contractual tie between BSI's payment to NASCAR and the amount of BSI's use of NASCAR's marks. Here, BSI pays and NASCAR receives royalties based on a percentage of BSI's sales of the licensed products.  Indeed, even the minimum annual guarantee under the contract is conceptually tied to a percentage of BSI's net sales, although the actual payment might not reflect the underlying sales if the net sales are too small.

**{¶ 65}** Although the tax commissioner did not specifically refer to the first sentence of R.C. 5751.033(F) when he assessed the licensing-fee receipts, BSI's royalty payments trigger the first sentence of that provision by tying the licensing-fee receipts to the amounts that BSI realizes by using NASCAR's marks.  R.C. 5751.033(F) thereby requires that the receipts be sitused to Ohio to the extent that a reasonable allocation method can be found.

*C.  NASCAR errs by restrictively interpreting R.C. 5751.033(F) with respect to receipts*

**{¶ 66}** NASCAR advances two arguments against the allocation of the receipts to Ohio—one that raises an issue of fact and one that raises an issue of statutory construction.

**{¶ 67}** Regarding the factual matter, NASCAR maintains that its "licensees did not 'use' any intellectual property in Ohio" and therefore its own receipts were not "based on the ***amount of use*** of the property in" Ohio.  (Boldface and italics sic.)  Although NASCAR makes these assertions primarily regarding the broadcast-revenue assessment, its assertions are also directed at the other receipt categories. But NASCAR has offered no evidence as to whether BSI used its marks in Ohio, so it has failed to support its bare statement that the marks were not used in Ohio by BSI or other licensees.  And as the party challenging the assessment, NASCAR

has the burden to prove the manner and extent of any error in the assessment.

{¶ 68} NASCAR also maintains that no portion of its receipts may be allocated to Ohio because NASCAR "gets paid the same no matter if its intellectual property even makes it to Ohio." NASCAR asserts, "NASCAR could receive more revenue based on BSI's overall sales, but NASCAR's revenue was not tied to sales in any particular state, and NASCAR did not direct the location of sales." In essence, NASCAR argues that because it gets paid based on BSI's net sales regardless of where BSI uses NASCAR's marks, the amount does not vary based on the specific geographic location (e.g., Ohio) where the marks are used, and accordingly, none of NASCAR's receipts may be sitused to Ohio no matter how much BSI actually used the marks in Ohio.

{¶ 69} That argument implicitly relies on a reading of the first sentence of R.C. 5751.033(F) as requiring the contract between NASCAR and BSI to specify a link between payment and receipt and the specific location where the marks are used before the receipts may be sitused to Ohio. Put differently, under NASCAR's interpretation of R.C. 5751.033(F), the first sentence of the provision is not triggered merely because the contract ties the receipts to the amount of use; instead, the contract itself must explicitly tie the receipts to the amount of use *in Ohio* as opposed to elsewhere.

{¶ 70} I conclude that the only contractual link necessary to trigger the first sentence of R.C. 5751.033(F) is one that ties NASCAR's receipts to BSI's amount of use of the marks generally. Under a proper reading of the first sentence of the provision, whether the receipts should be allocated to Ohio becomes a factual issue once the predicate contractual tie to the amount of use is satisfied. That is apparent in the text of the statute. The second sentence of R.C. 5751.033(F) begins: "If the receipts are not based on the amount of use of the property, but rather on the right to use the property, [then] * * *." By conditioning its own applicability on the receipts not being based on the amount of use of the property, the second sentence

of R.C. 5751.033(F) confirms that its first sentence does apply whenever the receipts are "based on the amount of use"—without any additional need for contractual specificity about where the use occurs.

## III. Whether the tax commissioner's method of allocating the licensing-fee receipts to Ohio was valid

### A. BSI's "net sales" may reasonably be construed to reflect BSI's use of NASCAR's marks

{¶ 71} NASCAR challenges not only the propriety of situsing various categories of receipts to Ohio, but the method that the tax commissioner used to determine situs. With respect to the licensing-fee receipts, NASCAR contends, "BSI has not been using NASCAR intellectual property in Ohio—it used the content outside of Ohio to design and create products." According to NASCAR, the design and manufacture of the licensed items constitutes use, but the sale and resale of those items to consumers does not.

{¶ 72} NASCAR points to no authority to support this position. R.C. 5751.033 does not define what constitutes "use" of intellectual property. In Ohio's individual-income-tax scheme, use of intellectual property is defined in terms of where an item is manufactured rather than where the item is sold. *See* R.C. 5747.20(B)(4) (a patent is "utilized in a state to the extent that it is employed in production, fabrication, manufacturing, or other processing in the state, or to the extent that a patented product is produced in the state"; and a copyright is "utilized in a state to the extent that printing or other publication originates in the state").

{¶ 73} On the other hand, Ohio's corporation franchise tax allocates "[n]et rents, net royalties, and net technical assistance fees from intangible property" to Ohio "to the extent that the activity of the payor thereof giving rise to the payment takes place in this state." R.C. 5733.051(G). In this case, royalties received by NASCAR are tied to "net sales" by BSI. For CAT purposes, whenever a contractual arrangement involving payment for the right to use intellectual property

22

ties the amount of payment to a percentage of the payor's activity, that activity should be presumed to constitute use of the property for purposes of R.C. 5751.033(F). That presumption may then be subject to rebuttal by the taxpayer, who is free to offer proof that the payor's use of the property involves some other activity in some other geographic location. Here, NASCAR has offered no proof that BSI used NASCAR's marks exclusively outside of Ohio.

*B. The tax commissioner may assess taxes based on "information in his possession," and the assessment is subject to rebuttal*

{¶ 74} NASCAR also places at issue the reasonableness of the method the tax commissioner used to situs NASCAR's receipts to Ohio: the proportion of Ohio's population to the United States' population for the years at issue. This method constitutes, at best, a crude approximation—the actual net-sales data from BSI and other licensees would furnish the best basis for determining allocation.

{¶ 75} When auditing NASCAR's receipts, the tax commissioner did not disagree with the proposition that actual sales data would provide the best evidence for allocation purposes, but he did not have BSI's sales information. During the audit, the tax commissioner's auditors explained that NASCAR had not supplied information concerning the locations of the licensees' sales and that "[t]he 'use of' the license aids in the sale of the licensee's product and the 'use of' or benefit is received where the licensee's product is sold." Additionally, the auditors noted that "[t]he taxpayer contends that they cannot know states where licensed products are sold by the licensee to situs the receipts to any state," but also observed that "the agreements stipulate [that] NASCAR has the right to inspect the records of the licensee to verify [that the] terms of the agreement are being upheld." Accordingly, because NASCAR failed to supply sufficiently specific evidence as to BSI's sales, the auditors sitused the receipts in the licensing-fees category to Ohio based on the ratio of Ohio's population to the total population of the United States.

{¶ 76} The population-ratio methodology used by the tax commissioner is

consistent with Ohio's assessment statute, R.C. 5751.09, and caselaw applying similar statutes. R.C. 5751.09 authorizes the tax commissioner to "make an assessment, *based on any information in the commissioner's possession*, against any person that fails to file a return or pay any tax as required by this chapter." (Emphasis added.) In construing a similar statute, this court held that an assessment by the tax commissioner based on information available to him at the time of the assessment may be valid even when that information later proves to be unreliable to some degree. *See, e.g.*, *Federated Dept. Stores, Inc., Rike-Kumler Div. v. Lindley*, 5 Ohio St.3d 213, 215-216, 450 N.E.2d 687 (1983). And the BTA properly affirms an assessment that the tax commissioner based on a factual presumption to the extent that the taxpayer did not supply required documentation that would rebut the presumption. *See Ohio Fast Freight, Inc. v. Porterfield*, 29 Ohio St.2d 69, 71, 278 N.E.2d 361 (1972); *see also Midwest Transfer Co. v. Porterfield*, 13 Ohio St.2d 138, 141, 235 N.E.2d 511 (1968) ("by their own improper and erroneous reporting," the taxpayers "invited the commissioner's investigation and audit, and, if his findings and the assessments based thereon were faulty and incorrect, the burden rested on the [taxpayers] to show in what manner and to what extent he was wrong"). Accordingly, when a taxpayer appeals an assessment to the BTA, the BTA must presume the tax commissioner's findings to be valid and the taxpayer has the burden to show the manner and extent of the tax commissioner's error by a preponderance of the evidence. *See Accel, Inc. v. Testa*, 152 Ohio St.3d 262, 2017-Ohio-8798, 95 N.E.3d 345, ¶ 14, 16.

{¶ 77} In this case, NASCAR has consistently adhered to its position that the proper situs of the licensing-fee receipts was Florida, but it failed to supply information, both when the tax commissioner asked for it and when the case was before the BTA, to make its case for allocating those receipts based on sales information from its licensees. Because NASCAR has not rebutted the tax commissioner's findings supporting the assessment with necessary documentation,

I would uphold the tax commissioner's method of allocating the licensing-fee receipts.

### IV. Allocating licensing-fee receipts to Ohio based on net-sale royalties does not constitute unlawful double taxation

{¶ 78} In its brief, NASCAR asserts that by taxing BSI when BSI sells licensed items in Ohio and taxing NASCAR on the percentage-of-sales-based royalty it receives from BSI for the same Ohio sales, "the Tax Commissioner is double taxing the same transaction level rather than conducting the proper inquiry on what NASCAR sold in order to receive its receipts at question." NASCAR also argues that similar taxation regarding the broadcast revenue constitutes unlawful double taxation.

{¶ 79} NASCAR is incorrect. The CAT does tax BSI on its sales in Ohio, *see* R.C. 5751.033(B), and it also taxes NASCAR on the royalties it receives as a percentage of BSI's sales in Ohio. The putative basis for NASCAR's objection is that the same underlying sales constitute the source of the revenue streams for both taxes. But the objection goes too far. If a homeowner hires a plumber to fix his sink and pays the plumber with earnings that Ohio has already taxed, Ohio is fully justified in also taxing what the homeowner paid the plumber as part of the plumber's earnings. The tax on the plumber is not an unlawful "double tax." Nor is it correct to say that the tax on BSI and the tax on NASCAR are at "the same transaction level." BSI is taxed because it sold the licensed items in Ohio, which is one transaction level; NASCAR is taxed because it sold BSI a license to use NASCAR's marks, which is a separate transaction level.

### V. Conclusion

{¶ 80} For the reasons stated above, I concur in the majority opinion in part and dissent in part.

DONNELLY and BRUNNER, JJ., concur in the foregoing opinion.

––––––––––––––––––

25

Taft, Stettinius & Hollister, L.L.P., Jeremy A. Hayden, Aaron M. Herzig, and Brian A. Morris, for appellant.

Dave Yost, Attorney General, Benjamin M. Flowers, Solicitor General, John L. Rockenbach, Deputy Solicitor General, and Christine T. Mesirow and Raina Nahra Boulos, Assistant Attorneys General, for appellee, Tax Commissioner Jeffrey McClain.

Kevin Shimp, urging reversal for amicus curiae, Ohio Chamber of Commerce.

_____